**LeClairRyan**
*A Professional Corporation*
One Riverfront Plaza
1037 Raymond Boulevard
Newark, New Jersey 07102
(973) 491-3600
Attorneys for Plaintiff, Super 8 Worldwide, Inc., formerly known as Super 8 Motels, Inc.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| SUPER 8 WORLDWIDE, INC., formerly known as SUPER 8 MOTELS, INC., a South Dakota Corporation, | : : : | Civil Action No. 17- |
| Plaintiff, | : | |
| v. | : | |
| RIVERWALK ALAMO HOSPITALITY, LLC, a Texas Limited Liability Company; KUMUD MEHTA, an individual; SAMIR DESAI, an individual; NIMESH DESAI, an individual; and VIVEK MEHTA, an individual, | : : : : : | **VERIFIED COMPLAINT** |
| Defendants. | | |

Plaintiff Super 8 Worldwide, Inc., formerly known as Super 8 Motels, Inc., by its

attorneys, LeClairRyan, complaining of defendants Riverwalk Alamo Hospitality, LLC, Kumud

Mehta, Samir Desai, Nimesh Desai, and Vivek Mehta, says:

**PARTIES, JURISDICTION AND VENUE**

1.      Plaintiff Super 8 Worldwide, Inc., formerly known as Super 8 Motels, Inc.,

("SWI") is a corporation organized and existing under the laws of the State of South Dakota,

with its principal place of business in Parsippany, New Jersey.

2.      Defendant Riverwalk Alamo Hospitality, LLC ("Riverwalk Alamo"), on

information and belief, is a limited liability company organized and existing under the laws of

SWI 2942
19751230_1
23839.1535

the State of Texas, with its principal place of business at 1614 N. St. Mary's Street, San Antonio, Texas.

3. Defendant Kumud Mehta, on information and belief, is a member of Riverwalk Alamo and a citizen of the State of New Jersey, having an address at 268 Levinberg Lane, Wayne, New Jersey.

4. Defendant Samir Desai, on information and belief, is a member of Riverwalk Alamo and a citizen of the State of New Jersey, having an address at 268 Levinberg Lane, Wayne, New Jersey.

5. Defendant Nimesh Desai, on information and belief, is a member of Riverwalk Alamo and a citizen of the State of New York, having an address at 1434 Rose Hill Boulevard, Niskayuna, New York.

6. Defendant Vivek Mehta, on information and belief, is a member of Riverwalk Alamo and a citizen of the State of New Jersey, having an address at 268 Levinberg Lane, Wayne, New Jersey.

7. Upon information and belief, Kumud Mehta, Samir Desai, Nimesh Desai, and Vivek Mehta are the only constituent members of Riverwalk Alamo.

8. The amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332 & 1338, 15 U.S.C. § 1121 and, with respect to certain claims, 28 U.S.C. § 1367.

10. This Court has personal jurisdiction over Riverwalk Alamo by virtue of, among other things, section 17.6.3 of the January 7, 2005 franchise agreement by and between Riverwalk Alamo and SWI, (the "Franchise Agreement"), described in more detail below,

2

pursuant to which Riverwalk Alamo has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

11.     This Court has personal jurisdiction over Kumud Mehta, Samir Desai, Nimesh Desai, and Vivek Mehta by virtue of, among other things, the terms of a guaranty (the "Guaranty"), described in more detail below, pursuant to which Kumud Mehta, Samir Desai, Nimesh Desai, and Vivek Mehta acknowledged that they were personally bound by section 17 of the Franchise Agreement.

12.     Venue is proper in this District pursuant to section 17.6.3 of the Franchise Agreement, inasmuch as that provision contains an express waiver by Riverwalk Alamo of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Super 8® Marks

13.     SWI is one of the largest guest lodging facility franchise systems in the United States, and is widely known as a provider of guest lodging facility services.

14.     SWI owns and has the exclusive right to license the use of the service mark SUPER 8® and various related trade names, trademarks and service marks (certain of which are on the principal register of the United States Patent and Trademark Office), logos, and derivations thereof (the "Super 8® Marks"), as well as the distinctive Super 8® System, which provides guest lodging services to the public under the Super 8® name and certain services to its franchisees, including a centralized reservation system, advertising, publicity, and training services.

3

15.    SWI or its predecessors first used the SUPER 8 MOTEL mark in 1973, and the Super 8® Marks are in full force and effect.  The registered Super 8® Marks listed below are incontestable pursuant to 15 U.S.C. § 1065.

16.    SWI has given notice to the public of the registration of the Super 8® Marks as provided in 15 U.S.C. § 1111.

17.    SWI uses or has used the Super 8® Marks as abbreviations of its brand name.

18.    SWI has registered the Super 8® Marks as service marks with the US Patent and Trademark Office ("USPTO") and owns, among others, the following valid service mark registrations for the Super 8® Marks:

| MARK | LOGO | REGISTRATION NO | REGISTRATION DATE | CLASS |
|---|---|---|---|---|
| SUPER 8 | | 1602723 | Jun-19-1990 | 35, 42 |
| SUPER 8 & Design (b/w) |  | 3610108 | Apr-21-2009 | 35, 43 |
| SUPER 8 & Design (Color) |  | 3610109 | Apr-21-2009 | 35, 43 |
| SUPER 8 HOTEL & Plaque Design |  | 1951982 | Jan-23-1996 | 42 |
| SUPER 8 MOTEL & |  | 1128057 | Dec-18-1979 | 42 |

4

| Design | | | | |
|--------|--|--|--|--|

19.     The USPTO registrations for the Super 8® Marks are valid and subsisting and in full force and effect and appear on the Principal Trademark Register of the USPTO.  All of the above listed Super 8 ® Marks have achieved incontestable status pursuant to the Lanham Act, 15 U.S.C. § 1065.  Such incontestable federal registrations for the Super 8® Marks constitute conclusive evidence of the validity of the Super 8® Marks and SWI's ownership of the Super 8® Marks and the exclusive right to use the marks nationwide.

20.     Through its franchise system, SWI markets, promotes, and provides services to its guest lodging franchisees throughout the United States.  In order to identify the origin of their guest lodging services, SWI allows its franchisees to utilize the Super 8® Marks and to promote the Super 8® brand name.

21.     SWI has invested substantial effort over a long period of time, including the expenditure of millions of dollars, to develop goodwill in its trade names and service marks to cause consumers throughout the United States to recognize the Super 8® Marks as distinctly designating SWI guest lodging services as originating with SWI.

22.     The value of the goodwill developed in the Super 8® Marks does not admit of precise monetary calculation, but because SWI is one of the largest guest lodging facility franchise systems in the United States and is widely known as a provider of guest lodging facility services, the value of SWI's goodwill exceeds hundreds of millions of dollars.

23.     The Super 8® Marks are indisputably among the most famous in the United States.

### The Agreements Between The Parties

24.     On or about January 7, 2005, SWI entered into the Franchise Agreement with Riverwalk Alamo for the operation of a 62-room guest lodging facility located at 1614 N. St. Mary's Street, San Antonio, Texas 78215, Site No. 02942-82782-04 (the "Facility").   A true copy of the Franchise Agreement is attached hereto as Exhibit A.

25.     Pursuant to section 5 of the Franchise Agreement, Riverwalk Alamo was obligated to operate a Super 8® guest lodging facility for a twenty-year term.

26.     Pursuant to section 7 and Schedule C of the Franchise Agreement, Riverwalk Alamo was required to make certain periodic payments to SWI for royalties, system assessments, taxes, interest, reservation system user fees, and other fees (collectively, "Recurring Fees").

27.     Pursuant to section 7.3 of the Franchise Agreement, Riverwalk Alamo agreed that interest is payable "on any past due amount payable to [SWI] under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

28.     Pursuant to section 3.8 of the Franchise Agreement, Riverwalk Alamo was required to prepare and submit monthly reports to SWI disclosing, among other things, the amount of gross room revenue earned by Riverwalk Alamo at the Facility in the preceding month for purposes of establishing the amount of royalties and other Recurring Fees due to SWI.

29.     Pursuant to section 3.8 of the Franchise Agreement, Riverwalk Alamo agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.8 and 4.8 of the

Franchise Agreement, Riverwalk Alamo agreed to allow SWI to examine, audit, and make copies of the entries in these books, records, and accounts.

30.   Pursuant to section 11.2 of the Franchise Agreement, SWI could terminate the Franchise Agreement, with notice to Riverwalk Alamo, if Riverwalk Alamo (a) discontinued operating the Facility as a Super 8® guest lodging establishment or (b) lost possession or the right to possession of the Facility.

31.   Pursuant to section 12.1 of the Franchise Agreement, Riverwalk Alamo agreed that, in the event of a termination of the Franchise Agreement pursuant to section 11.2, it would pay liquidated damages to SWI in accordance with a formula specified in the Franchise Agreement.

32.   Pursuant to section 12.1 of the Franchise Agreement, liquidated damages were set at the sum of the Royalties and System Assessment Fees at the Facility for the 36 months prior to termination.

33.   Section 13 of the Franchise Agreement specified Riverwalk Alamo's obligations in the event of a termination of the Franchise Agreement, including its obligation to immediately cease using all of the Super 8® Marks.

34.   Pursuant to section 17.4 of the Franchise Agreement, Riverwalk Alamo agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [Franchise] Agreement or collect amounts owed under this [Franchise] Agreement."

35.   Pursuant to section 13.2 of the Franchise Agreement, Riverwalk Alamo agreed that, when the Franchise Agreement is terminated, SWI has the right to "without prior notice enter the Facility, and any other parcels, . . . and paint over or remove and purchase for $10.00,

all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that [Riverwalk Alamo] [has] not removed or obliterated within five days after termination."

36.     Effective as of the date of the Franchise Agreement, Kumud Mehta, Samir Desai, Nimesh Desai, Rajiv Mehta, Priti Shah, and Alpa Shah provided SWI with a Guaranty[1, 2] of Riverwalk Alamo's obligations under the Franchise Agreement.  A true copy of the Guaranty is attached hereto as Exhibit B.

37.     Pursuant to the terms of the Guaranty, Kumud Mehta, Samir Desai, Nimesh Desai, and Vivek Mehta agreed, among other things, that upon a default under the Franchise Agreement, they would "immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the [Franchise] Agreement."

38.     Pursuant to the terms of the Guaranty, Kumud Mehta, Samir Desai, Nimesh Desai, and Vivek Mehta agreed to pay the costs, including reasonable attorneys' fees, incurred by SWI in enforcing its rights or remedies under the Guaranty or the Franchise Agreement.

## The Defendants' Termination of the Franchise Agreement

39.     By letter dated April 29, 2016, Riverwalk Alamo advised SWI that it intended to cease operating the Facility as a Super 8® guest lodging facility effective May 31, 2016, thereby unilaterally terminating the Franchise Agreement.

---

[1] By Amendment dated November 29, 2005, a true copy of which is attached hereto as Exhibit C, Schedule B of the Franchise Agreement was amended to reflect the new ownership breakdown of Riverwalk Alamo.  In conjunction with the November 29, 2005 amendment, Kumud Mehta, Samir Desai and Nimesh Desai executed a revised Guaranty attached as Exhibit D.
[2] By Amendment dated September 28, 2006, a true copy of which is attached hereto as Exhibit E, Schedule B of the Franchise Agreement was amended to reflect the new ownership breakdown of Riverwalk Alamo.  In conjunction with the September 28, 2006 amendment, Kumud Mehta, Samir Desai, Nimesh Desai, and Vivek Mehta executed a revised Guaranty attached as Exhibit F.

40.     By letter dated May 23, 2016, a true copy of which is attached as <u>Exhibit G</u>, SWI acknowledged Riverwalk Alamo's unilateral termination of the Franchise Agreement, effective May 31, 2016, and advised Riverwalk Alamo that (a) they had to de-identify the Facility within 10 days from delivery of the termination notice, (b) all items bearing the Super 8® Marks had to be removed, (c) they were required to pay to SWI as liquidated damages for premature termination the sum of $148,160.86 as required under the Franchise Agreement, and (d) demand was made for all outstanding Recurring Fees through the date of termination.

41.     The termination of the Franchise Agreement precludes Riverwalk Alamo from any further use of the Super 8® Marks in or around the Facility.

42.     The termination of the Franchise Agreement precludes Riverwalk Alamo from any further use of the Super 8® Marks to induce the traveling public to use the Facility in any way.

43.     Since the termination of the Franchise Agreement, Riverwalk Alamo has continued to use the Super 8® Marks to induce the traveling public to rent guest rooms at the Facility.

44.     Since the termination of the Franchise Agreement, Riverwalk Alamo has used the Super 8® Marks without authorization to rent rooms through, among other things, failure to remove Super 8® signage and continuing to identify the Facility as a Super 8® guest lodging facility.

45.     Riverwalk Alamo has continued to misuse the Super 8® Marks despite receiving notification from SWI to cease and desist from the misuse of the Super 8® Marks.

## FIRST COUNT

46.     SWI repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 45 of the Verified Complaint.

47.     Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), provides in pertinent part that "[a]ny person who shall, without the consent of the registrant — use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant . . . ."

48.     Riverwalk Alamo marketed, promoted, and rented, and continues to market, promote, and rent rooms at the Facility through the unauthorized use of the Super 8® Marks, and such use caused and is likely to continue to cause confusion or mistake among prospective or actual customers, in violation of Section 32 of the Lanham Act.

49.     Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in pertinent part that "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to affiliation . . . or as to the origin, sponsorship, or approval of . . . goods and/or services . . . shall be liable in a civil action . . . ."

50.     The acts of Riverwalk Alamo in marketing, promoting, and renting rooms at the Facility, through and with the Super 8® Marks, constitute:

        a)  a false designation of origin;

        b)  a false and misleading description of fact; and

        c)  a false and misleading representation of fact;

that caused and are likely to continue to cause confusion, or to cause mistake, or deception, as to the affiliation of Riverwalk Alamo's Facility with SWI, and to cause confusion, or to cause mistake, or deception, to the effect that SWI sponsors or approves of the guest lodging services that Riverwalk Alamo provides at the Facility, all in violation of Section 43(a) of the Lanham Act.

51.     Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), provides in pertinent part that "[t]he owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection."

52.     Riverwalk Alamo's use of the Super 8® Marks in connection with goods and services at the Facility, after the Super 8® Marks became famous, caused and will continue to cause dilution and disparagement of the distinctive quality of the Super 8® Marks, and lessened and will continue to lessen the capacity of the Super 8® Marks to identify and distinguish the goods and services of SWI, all in violation of Section 43(c) of the Lanham Act.

53.     Riverwalk Alamo's on-going acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act are malicious, fraudulent, willful, and deliberate.

54.     Riverwalk Alamo's on-going acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act have inflicted and continue to inflict irreparable harm on SWI.

55.     SWI has no adequate remedy at law.

56.     No previous injunctive relief has been awarded with respect to this matter in this case or any other case.

11

**WHEREFORE**, pursuant to 15 U.S.C. §§ 1114, and 1125(a) & (c), SWI demands judgment against Riverwalk Alamo:

a)     Preliminarily and permanently restraining and enjoining Riverwalk Alamo, its affiliates, subsidiaries, officers, agents, servants, employees and attorneys, and all those who act in concert or participation with them, from marketing, promoting, or selling guest lodging services at the Facility through and with the Super 8® Marks; and

b)     Granting compensatory damages, treble damages, attorneys' fees, prejudgment interest, costs of suit, and such other and further relief as this Court shall deem just and proper.

## SECOND COUNT

57.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 56 of the Verified Complaint.

58.     Pursuant to sections 3.8 and 4.8 of the Franchise Agreement, Riverwalk Alamo agreed to allow SWI to examine, audit, and make copies of Riverwalk Alamo's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

59.     Riverwalk Alamo has engaged in acts and practices, as described, which amount to infringement of the Super 8® Marks in an unlawful, unfair, and fraudulent manner which is likely to confuse the public.

60.     As a result, Riverwalk Alamo owes restitution and the disgorgement of profits, in an amount unknown to SWI, and which amount cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Riverwalk Alamo.

12

**WHEREFORE**, SWI demands judgment ordering that Riverwalk Alamo account to SWI for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility through and with the Super 8® Marks.

### THIRD COUNT

61.    SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 60 of the Verified Complaint.

62.    By letter dated May 23, 2016, SWI acknowledged Riverwalk Alamo's unilateral termination of the Franchise Agreement effective May 31, 2016 due to Riverwalk Alamo's failure to operate the Facility as a Super 8® guest lodging facility.

63.    Section 12.1 of the Franchise Agreement provides that, in the event of termination of the Franchise Agreement due to action of the Riverwalk Alamo, Riverwalk Alamo shall pay liquidated damages to SWI within 30 days of termination.

64.    As a result of the termination of the Franchise Agreement, Riverwalk Alamo is obligated to pay SWI liquidated damages in the amount of $148,160.86, as calculated pursuant to section 12.1 of the Franchise Agreement.

65.    Notwithstanding SWI's demand for payment, Riverwalk Alamo has failed to pay SWI the liquidated damages as required in section 12.1 of the Franchise Agreement.

66.    SWI has been damaged by Riverwalk Alamo's failure to pay liquidated damages.

**WHEREFORE**, SWI demands judgment against Riverwalk Alamo for liquidated damages in the amount of $148,160.86, together with interest, attorneys' fees, and costs of suit.

## FOURTH COUNT

67.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 66 of the Verified Complaint.

68.     By virtue of the premature termination of the Franchise Agreement, SWI sustained a loss of future revenue over the remainder of the 20-year term of the Franchise Agreement.

69.     If the Court determines that Riverwalk Alamo is not liable to pay SWI liquidated damages as required by section 12.1 of the Franchise Agreement then, in the alternative, Riverwalk Alamo is liable to SWI for actual damages for the premature termination of the Franchise Agreement.

70.     SWI has been damaged by Riverwalk Alamo's breach of its obligation to operate a Super 8® guest lodging facility for the remaining term of the Franchise Agreement.

**WHEREFORE**, SWI demands judgment against Riverwalk Alamo for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

## FIFTH COUNT

71.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 70 of the Verified Complaint.

72.     Pursuant to section 7 and Schedule C of the Franchise Agreement, Riverwalk Alamo was obligated to remit Recurring Fees to SWI.

73.     Despite its obligation to do so, Riverwalk Alamo failed to remit certain of the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $234,641.22.

74.     Riverwalk Alamo's failure to remit the agreed Recurring Fees constitutes a breach of the Franchise Agreement and has damaged SWI.

**WHEREFORE**, SWI demands judgment against Riverwalk Alamo for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $234,641.22, together with interest, attorneys' fees, and costs of suit.

## SIXTH COUNT

75.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 74 of the Verified Complaint.

76.     At the time of the termination of the Franchise Agreement, Riverwalk Alamo was obligated to pay SWI Recurring Fees.

77.     Despite its obligation to do so, Riverwalk Alamo failed to pay certain of the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $234,641.22.

78.     In addition, Riverwalk Alamo benefited from its wrongful use of the Super 8® Marks after termination of the Franchise Agreement and paid no royalty or other Recurring Fees to SWI in return for that benefit.

79.     Riverwalk Alamo's failure to compensate SWI constitutes unjust enrichment and has damaged SWI.

**WHEREFORE**, SWI demands judgment against Riverwalk Alamo for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $234,641.22, together with interest, attorneys' fees, costs of suit, and all royalties and other Recurring Fees that should be paid to compensate SWI for the period during which Riverwalk

Alamo misused the Super 8® Marks and was thereby unjustly enriched, together with interest and costs of suit.

## SEVENTH COUNT

80.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 79 of the Verified Complaint.

81.     Pursuant to the terms of the Guaranty, Kumud Mehta, Samir Desai, Nimesh Desai, and Vivek Mehta agreed, among other things, that upon a default under the Franchise Agreement, they would immediately make each payment and perform each obligation required of Riverwalk Alamo under the Franchise Agreement.

82.     Despite their obligation to do so, Kumud Mehta, Samir Desai, Nimesh Desai, and Vivek Mehta have failed to make any payments or perform or cause Riverwalk Alamo to perform each obligation required under the Franchise Agreement.

83.     Pursuant to the Guaranty, Kumud Mehta, Samir Desai, Nimesh Desai, and Vivek Mehta are liable to SWI for Riverwalk Alamo's liquidated damages in the amount of $148,160.86, or actual damages in an amount to be determined at trial, and Riverwalk Alamo's Recurring Fees due and owing under the Franchise Agreement, in the current amount of $234,641.22, and for those additional Recurring Fees attributable to the period during which Riverwalk Alamo has misused the Super 8® Marks.

**WHEREFORE**, SWI demands judgment against Kumud Mehta, Samir Desai, Nimesh Desai, and Vivek Mehta for damages in the amount of:

a)     All Recurring Fees due and owing under the Franchise Agreement, together with interest, attorneys' fees, and costs of suit; and

b)      All profits, royalties, and other Recurring Fees that should be paid to compensate SWI for the period during which Riverwalk Alamo misused the Super 8® Marks and was thereby unjustly enriched, together with interest, attorneys' fees, and costs of suit.

## EIGHTH COUNT

84.      SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 83 of the Verified Complaint.

85.      By letter dated May 23, 2016, SWI acknowledged Riverwalk Alamo's unilateral termination of the Franchise Agreement effective May 31, 2016 because Riverwalk Alamo ceased to operate the Facility as a Super 8® guest lodging facility.

86.      Section 13.2 of the Franchise Agreement provides that, when the Franchise Agreement is terminated, SWI has the right to "without prior notice enter the Facility, and any other parcels, . . . and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that [Riverwalk Alamo] [has] not removed or obliterated within five days after termination."

87.      Riverwalk Alamo continues to market, promote, and rent rooms at the Facility through the unauthorized use of the Super 8® Marks, and such use caused and is likely to continue to cause confusion or mistake among prospective or actual customers.

88.      Riverwalk Alamo's unauthorized use of the Super 8® Marks has inflicted and continues to inflict irreparable harm on SWI.

**WHEREFORE**, SWI demands judgment declaring that SWI, or its authorized agent, has the right, without prior notice to Defendants, to enter the property at the Facility and

remove any and all exterior signage, exterior items and other exterior materials displaying the Super 8® Marks.

**LeClairRyan**
Attorneys for Plaintiff,
Super 8 Worldwide, Inc.,
formerly known as Super 8 Motels, Inc.

By:_____
　　　**BRYAN P. COUCH**

Dated: 2/8/17

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

**LeClairRyan**
Attorneys for Plaintiff,
Super 8 Worldwide, Inc.,
formerly known as Super 8 Motels, Inc.

By:_____
　　　**BRYAN P. COUCH**

Dated: 2/8/17

## VERIFICATION

STATE OF NEW JERSEY      )
                         ) ss:
COUNTY OF MORRIS         )


           **SUZANNE FENIMORE**, of full age, being duly sworn according to law, upon her oath, deposes and says:

           I am the Senior Director of Contracts Compliance for Super 8 Worldwide, Inc., formerly known as Super 8 Motels, Inc., which is plaintiff in this action.

           I have read the foregoing Verified Complaint and all the allegations contained therein.  Except as to allegations alleged upon information and belief, which allegations I believe to be true, all the allegations in the Verified Complaint are true based on my personal knowledge, the records of SWI and/or information available through employees of SWI.

                                                              **SUZANNE FENIMORE**

Sworn and subscribed to before
me this ___18th___ day of January, 2017


_____
        NOTARY PUBLIC

           **KAREN A. BROMM**
            NOTARY PUBLIC
          STATE OF NEW JERSEY
             ID # 2283264
     MY COMMISSION EXPIRES JAN. 24, 2022

19

# EXHIBIT A

Location: San Antonio, TX
Entity No. 82782
Unit No.: 2942

## SUPER 8 MOTELS, INC.
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement"), dated _____ 1/7 , 200 5 , is between **SUPER 8 MOTELS, INC.**, a South Dakota corporation ("we", "our" or "us"), and **RIVERWALK ALAMO HOSPITALITY, LLC**, a Texas limited liability company ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

This transaction involves the transfer of an existing Chain Facility at the Location first granted to **Regency Motor Inn** ("Prior Franchisee") in a Franchise Agreement with us dated **April 3, 2000** (the "Prior Agreement"). You assume and obligate yourself to perform any and all of the obligations (financial and otherwise) of the Prior Franchisee under the Prior Agreement that is not paid or performed as of the date of this Agreement, including without limitation, the obligation to pay any unpaid Royalties, System Assessment Fees or other amounts due us and to correct any uncured defaults other than as expressly superseded by this Agreement. You acknowledge that you must pay a retraining fee to us for updating the Facility's property management information system.

1.   **License.**   We have the exclusive right to license and franchise to you the distinctive "Super 8" System for providing economy lodging motel services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. The License is effective only at the Location and may not be transferred or relocated. You will call the Facility a "Super 8 Motel" and you may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term.

2.   **Protected Territory.**   We will not own, operate, lease, manage, or license anyone but you to operate a Chain Facility of the same name (Super 8 Motel) in the "Protected Territory", defined in Appendix A, while this Agreement is in effect. We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you. We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory. While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise any guest lodging facility other than the Facility in the Protected Territory (other than the Facility) unless we or our affiliate licenses the facility. You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities. This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located with the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its franchise with us terminated or is not renewed. The Protected Territory fairly represents the Facility's trading area, and you acknowledge that. There are no express or implied territorial rights or agreements between the parties except as stated in this Section. The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only.

3.   **Your Improvement and Operating Obligations.**   Your obligations to improve, operate

and maintain the Facility ar

3.1   **Improvements.** You must select and acquire the Location and the Facility and acquire, equip and supply the Facility in accordance with System Standards for entering conversion facilities. You must begin improvement of the Facility no later than thirty (30) days after the Effective Date. The Facility must score 200 or fewer points (or equivalent score under a successor quality assurance scoring system we employ), within ninety (90) days after the Effective Date. You must thereafter continue renovation and improvement of the Facility as the Punch List requires and pass any related quality assurance inspection within nine (9) months after the Effective Date. All improvements will comply with System Standards, any Approved Plans, Schedule B and any Punch List attached to this Agreement. Your general contractor or you must carry the insurance required under this Agreement during renovation. If you do not commence or complete the improvement of the Facility by the dates specified in this Section 3.1, or the Facility does not meet the post-transfer quality assurance inspection standard or complete the post-transfer improvements specified in the Punch List after the Effective Date, then we may, in our sole discretion, terminate this Agreement by giving written notice to you. Time is of the essence for the Improvement Obligation. We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation. The grant of an extension will not waive any other default existing at the time the extension is granted.

3.2   **Improvement Plans.** You will create plans and specifications for the work described in Section 3.1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location. We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like. Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements. We will not be liable to you or your lenders, contractors, employees, guests or others on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction. Any material modifications to or variations from the Approved Plans require our prior written approval. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

3.3   **Opening.** You may continue to identify the Facility as part of the System prior to completing the Improvement Obligation.

3.4   **Operation.** You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards. You will not operate a Food and Beverage service without our prior written consent, except for a complimentary coffee service/continental breakfast in accordance with System Standards. If you do not manage the Chain Facility personally, you must employ a full-time general manager who will be dedicated solely to the Facility. You will keep the Facility in a clean, neat, and sanitary condition. You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual. You may add to or discontinue the amenities, services and facilities described in Schedule B, or to lease or subcontract any service or portion of the Facility only with our prior written consent, which we will not unreasonably withhold or delay. Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility.

2

3.5    **Training.**  If this is your first System franchise, you or one of your principal owners will attend an orientation program as described in Section 4.1.  The Facility's initial and any replacement general manager must complete to our satisfaction the manager training program described in Section 4.1, even if you employ other managers for other Chain Facilities who have already received such training.  You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement.  You will pay all travel, lodging, meals and compensation expenses of the people you send for training programs, tuition, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

3.6    **Marketing.**

3.6.1    You will participate in System marketing programs, including the Directory and the Reservation System.  You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System.  You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants.  You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards.  You may implement, at your option and expense, your own local advertising.  Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication.  You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.6.2    The Facility must participate in our Chain-wide Internet marketing activities like other marketing programs.  You will discontinue any Internet marketing that conflicts, in our reasonable discretion, with Chain-wide Internet marketing activities.  You must honor the terms of any participation agreement you sign for Internet marketing.  You shall pay when due any fees, commissions, charges and reimbursements relating to Internet marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis, provided that the activities carry aggregate fees per transaction of not more than the sum of the full agent commission specified on Schedule C for sales agents, plus 10% of the Chain's reported average daily rate for the preceding calendar year.  We may suspend the Facility's participation in Internet marketing activity if you default under this Agreement.

3.7    **Governmental Matters.**  You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote.  You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings.  You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

3.8    **Financial Books & Records; Audits.**

3.8.1    The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards.  You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation

3

you accept under this Agreement.

3.8.2  We may notify you of a date on which we propose to audit the Facility's books and records. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date. You need to inform us where the books and records will be produced. You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements relating to the Facility for the applicable accounting periods we require under this Agreement and System Standards. If our auditors must return to your location after the first date we confirm for the audit because you violate this Section 3.8.2 or refuse to cooperate with the reasonable requests of our auditors, you must pay us the Audit Fee under Section 4.8 when invoiced. We may also perform an audit of the Facility's books and records without advance notice. Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.8.3  We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.8.2 within 30 days after the date of the initial audit, (ii) you cancel 2 or more previously scheduled audits, (iii) you refuse to admit our auditors for an audit during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit. Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.8, an "Accounting Procedure Notice." You must also pay any deficiency in Recurring Fees or other charges we identify and invoice as a result of the audit. The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.

3.9  **Inspections.** You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement. You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice. The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection. If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any reinspection fee specified in System Standards Manuals (which is $750 on the Effective Date and will not exceed $2,500) plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection. We may also conduct paper and electronic customer satisfaction surveys of your guests and include the results in your final quality assurance score. We may publish and disclose the results of quality assurance inspections and guest surveys.

3.10  **Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual. Unless we instruct you otherwise, your liability insurance policies will name Super 8 Motels, Inc., Cendant Hotel Group, Inc. and Cendant Corporation, their successors and assigns as additional insureds.

4

3.11  **Conferences.**  Chain conferences are held on either a chain-wide or regional basis.  You or your representative must attend each Chain conference and pay the Conference Fee we set for Chain franchisees, if and when we determine to hold a Chain Conference.  If you operate other lodging facilities under the System in addition to the Facility, you must send a different representative to the Chain conference and pay another Conference Fee for each facility.  We will charge you and you must pay the Conference Fee even if you do not attend the Chain conference.  You will receive reasonable notice of a Chain conference.

3.12  **Purchasing.**  You will purchase or obtain certain items we designate as proprietary or that bear Marks, such as signage, only from suppliers we approve.  You may purchase any other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.13  **Good Will.**  You will use reasonable efforts to protect, maintain and promote the name "Super 8 Motels" and its distinguishing characteristics, and the other Marks.  You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in, conduct which is unlawful or damaging to the good will or public image of the Chain or System.  You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners.  You will refer any guest that the Facility cannot accommodate to the nearest Chain Facility unless and until the guest expresses a preference for a different lodging facility.  You will participate in any Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities.

3.14  **Facility Modifications.**  You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay.  You will pay our Rooms Addition Fee then in effect for each additional guest room you may add to the Facility over 120 rooms.  If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay.  You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.15  **Courtesy Lodging.**  You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

4.    **Our Operating and Service Obligations.**  We will provide you with the following services and assistance:

4.1  **Training.**  We will offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager and owner orientation training, on-site opening training, remedial training and supplemental training.

4.1.1  **General Manager Orientation Training.**  We will offer at a location in the United States we designate a general manager orientation training program.  The program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility.  Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction before the Opening Date. If we do not offer a place in general manager orientation within that time frame,

5

your general manager must attend the next program held at which we offer a place.  Any replacement general manager must complete general manager orientation within 90 days after he/she assumes the position or the next program available, whichever comes later.  Your general manager for the Facility must complete general manager orientation even if you employ managers at other Chain Facilities who have already received this training. We charge you tuition of $995 for your first general manager if you open the Facility with our approval and your general manager completes general manager orientation within the time period established under this Agreement. You must pay the tuition then in effect as disclosed in our latest Uniform Franchise Offering Circular ("UFOC"), but not more than $3,000, if you do not meet these deadlines.  For any supplemental or replacement general manager, you must pay the tuition in effect for the program when your manager attends the program.  You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits.

**4.1.2 Owner Orientation Training.**   We will offer an owner orientation training program to familiarize you with the System, the Chain, and our services.  If this is your first System franchise, you (or a person with executive authority if you are an entity) must attend owner orientation preferably before, but not later than 90 days after the Opening Date. If we do not offer owner orientation training within this time period, you must attend the next program offered. Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend owner orientation, but may choose to do so at their option. Owner orientation will be no longer than five days.  We charge you tuition of $825 if you open the Facility with our approval and attend owner orientation within the time periods established under this Agreement.  If you do not open the Facility and attend orientation by such deadlines, you must pay the tuition then in effect for this program as disclosed in our latest UFOC, but not more than $3,000.  You must also pay your travel, lodging, meal and incidental expenses.

**4.1.3 On-Site Opening Training.** We will provide at the Facility or another agreed location, and your staff must attend, on-site opening training (at our discretion as to length and scheduling) to assist you in opening the Facility. There is currently no charge for the initial training program.  You will pay the cost of any site used if the Facility is not available and the rent for any equipment we need.  You must provide lodging for our trainers at your expense. You must also pay, at our request, the reasonable travel, meal and out-of-pocket expenses incurred by our trainers for on-site opening training.

**4.1.4 Remedial Training.** We may require you, your general manager and/or your staff to participate in on-site remedial training if the Facility fails multiple quality assurance inspections and/or experiences significant complaints to our guest services department, as a condition to avoiding termination or to resumption of reservation service. You must pay the tuition in effect for this program when it is offered to you, and you must provide lodging for our trainers. As of March 31, 2003, tuition for remedial on-site training is $450 per day, which must be paid before the training commences.  We may increase the tuition charge in the future.  The length of the remedial training could be up to five days, depending on the severity of the quality assurance and/or customer service issues.

**4.1.5 Supplemental Training.**  We may offer other mandatory or optional training programs for reasonable tuition or without charge.  This training could be held in our U.S. training center or other locations. . You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this training.  This training may be held in conjunction with a Chain Lodging conference.  We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices. We may also offer Internet-based training via the Chain's intranet website.

6

4.1.6 Cancellation Fees. We will charge you a cancellation fee of 50% of the tuition for a program if you cancel your participation less than 15 days before it is scheduled to be held. If you fail to attend a training program as scheduled without notifying us in advance, your cancellation fee will be 100% of the tuition for the program. These fees are non-refundable and you will also be charged the full tuition in effect for the program when you reschedule your training.

4.2     **Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use System Assessment Fees as specified in Schedule C, allocated in our discretion from the Advertising and Reservation Fund, for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will provide software maintenance for the software we license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us or our affiliate. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. We will not offer to or accept from callers to our general consumer, toll-free telephone number in the United States reservations for any lodging facilities other than Chain Facilities. We may use funds in the Advertising and Reservation Fund to reimburse our reasonable direct and indirect costs, overhead or other expenses of operating the Reservation System.

4.3     **Marketing**

4.3.1   We will use System Assessment Fees, allocated in our discretion from the Advertising and Reservation Fund, to promote public awareness and usage of Chain Facilities by implementing appropriate international, national, regional and local advertising, promotion, publicity, market research and other marketing programs, training programs and related activities, and the production and distribution of System publications and directories of hotels. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. System Assessment Fees may reimburse us or an affiliate for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement the Advertising and Reservation Fund or to advance funds to pay for System marketing activities. We do not promise that you or the Facility will benefit directly or proportionately from System marketing activities.

4.3.2   We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3   We may, at our discretion, implement "group booking" programs created to encourage use of Chain Facilities for tours, conventions and the like, possibly for separate fees in addition to the System Assessment Fee, for any resulting group booking accepted at the Facility.

4.3.4   We will publish the Chain Directory. We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements. We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication. We may assess a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

7

4.4   **Purchasing.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

4.5   **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.

4.6   **Consultations and Standards Compliance.** We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on matters of Facility operation and marketing through our representatives. We will offer you access to any Internet website we may maintain to provide Chain franchisees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement. We may limit or deny access to any such website while you are in default under this Agreement.

4.7   **System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications. We will lend you one copy of the System Standards Manual promptly after we sign this Agreement. We will send you any System Standards Manual revisions and/or supplements as and when issued. We will send you all other publications for Chain franchisees and all separate policy statements in effect from time to time.

4.8   **Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.8. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.9. You will pay us an "Audit Fee" of $300.00 when we invoice you for an Audit Fee under Section 3.8. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs to not more than $500.00, effective any time after December 31, 2005. Our inspections are solely for the purposes of checking compliance with System Standards.

5.   **Term.** The Term begins on the Effective Date and expires at the end of the twentieth License Year. Some of your duties and obligations will survive termination or expiration of this Agreement. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

6.   **Application and Initial Fees.** We should receive from you a non-refundable Application Fee of $1,000.00. You will pay us a non-refundable Initial Fee in the amount of $24,000.00, when you sign this Agreement, which is fully earned when we sign this Agreement.

7.   **Recurring Fees, Taxes and Interest.**

7.1   You will pay us certain "Recurring Fees" in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States) 15 days after the month in which they accrue, without billing or demand. Recurring Fees include the following:

8

7.1.1   A "Royalty" equal to five percent (5%) of Gross Room Sales of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2   A "System Assessment Fee" as stated in Schedule C to be paid into the Advertising and Reservation Fund, accrues from the Opening Date until the end of the Term, including during suspension periods.  Upon 60 days written notice, we may change the System Assessment Fee after the tenth anniversary of the Effective Date to cover costs as described in Schedule C.  You will also pay or reimburse us as described in Schedule C for "Additional Fees" such as travel and other sales agent commissions paid for certain reservations at the Facility plus a reasonable service charge, a "GDS Fee" levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet, or other reservation systems and networks, and fees for additional services and programs.  We may increase or adjust the Additional Fees to cover the cost of the services or to add new services or programs at any time on not less than 60 days prior written notice.

7.2   "Taxes" are equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax; franchise or other tax for our privilege of doing business in your State.  You will pay Taxes directly to us when due.

7.3   "Interest" is payable on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.  Interest is payable when you receive our invoice.

7.4   If a Transfer occurs, your transferee or you will pay us a "Relicense Fee" equal to the Initial Fee we would then charge a new franchisee for the Facility.

8.   **Indemnifications.**

8.1   Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven.  You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury.  This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2   You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee.  You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest.  We must approve any resolution or course of

9

action in a matter that could directly or indirectly have any effect on parties other than you and the complaining party in the matter, or could serve as a precedent for other matters.

8.3   We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9. Your Assignments, Transfers and Conveyances.

9.1   **Transfer of the Facility.** This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your License is subject to termination when the Transfer occurs. The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2   **Public Offerings and Registered Securities.** You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $25,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3   **Conditions.** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a franchisee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new franchise applicant, pay the Application and Relicense Fees then in effect, sign the form of Franchise Agreement we then offer in conversion transactions and agree to renovate the Facility as we reasonably determine, if the Facility achieves a score of less than "Satisfactory" on its most recent Quality Assurance inspection. We will provide a Punch List of improvements we will require after we receive the transferee's Application. We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities, or in, the alternative, condition our approval of the Transfer on one or more of the following: limit the transferee's term to the balance

10

' of your Term, add a right to terminate without cause exercisable by either party after a period of time has elapsed, or allow you to terminate the License when you sell the Facility and pay us Liquidated Damages under Section 12.1 at the same rate as you would pay if the termination occurred before the Opening Date. Such payment would be due and payable when you transfer possession of the Facility. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

**9.4  Permitted Transferee Transactions.**  You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the Franchise Agreement form then offered prospective franchisees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

**9.5  Attempted Transfers.**  Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

**9.6  Notice of Transfers.**  You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

**10.  Our Assignments.**  We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

**11.  Default and Termination.**

**11.1  Default.**  In addition to the matters identified in Sections 3.1 and 3.8 you will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you under Section 11.2. We will not exercise our right to

SUPEXCI
16608? 8/04

terminate if you have completely cured your default, or until any waiting period required by law has elapsed, or, in the case of quality assurance default, you have acted diligently to cure the default but cannot do so and have entered into a written improvement agreement with us within 30 days after the failing inspection to cure the default within 90 days after the inspection. We may terminate this Agreement if you do not perform that improvement agreement.

11.2   **Termination.**   We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Section 3.1, (2) you discontinue operating the Facility as a "Super 8 Motel", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or franchise agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, (11) you or any of your Equity Interest owners contest in court the ownership or right to license or franchise all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

11.3   **Casualty and Condemnation.**

11.3.1   You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate the License, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If the License so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as a transient lodging facility after the Casualty.

11.3.2   You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

11.3.3   The exclusive territory covenants in Section 2 will terminate when you give us notice of any proposed Condemnation or that you will not restore the Facility after a Casualty.

11.4   **Our Other Remedies.**   If you violate your covenant in Section 2, we may reduce the Protected Territory to the Location. We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with

12

us relating to the Facility, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default. All Reservation System User Fees accrue during the suspension period. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Service Interruption Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration. We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory. You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief. We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice. If needed, our consent or approval may be withheld while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

11.5     **Your Remedies.** If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation. To the extent permitted by applicable law, this action shall be your exclusive remedy. We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

12.     <u>**Liquidated Damages.**</u>

12.1     **Generally.** If we terminate the License or this Agreement under Section 11.2, or you terminate the License or this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us within 30 days following the date of termination, as Liquidated Damages, an amount equal to the sum of accrued Royalties and System Assessment Fees during the immediately preceding 36 full calendar months (or the number of months remaining in the unexpired Term (the "Ending Period") at the date of termination, whichever is less). If the Facility has been open for fewer than 36 months, then the amount shall be the average monthly Royalties and System Assessment Fees since the Opening Date multiplied by 36. You will also pay any applicable Taxes assessed on such payment and Interest calculated under Section 7.3 accruing from 30 days after the date of termination. Before the Ending Period, Liquidated Damages will not be less than the product of $2,000 multiplied by the number of guest rooms you are then authorized to operate under Schedule B of this Agreement, as amended. If we terminate this Agreement under Section 3 before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable for termination under Section 11.2. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement are not affected.

12.2     **Condemnation Payments.** If a Condemnation occurs, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2 or until the Condemnation occurs, whichever is longer. If the Condemnation is completed before the one year notice period expires, you will pay us Liquidated Damages equal to the average daily Royalties and System Assessment Fees for the 12 month period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). If the Condemnation is completed after the one year notice period expires you will pay no Liquidated Damages, but the fees

13

set forth in Section 7 must be paid when due until Condemnation is completed.

12.3    **Exclusions.** The amount of System Assessment Fees used in the computation of Liquidated Damages shall exclude travel agent commissions, airline reservation system charges and related handling charges.

13.    <u>Your Duties At and After Termination.</u>   When this Agreement terminates for any reason whatsoever:

13.1    **System Usage Ceases.** You will immediately stop using the System to operate and identify the Facility. You will remove all signage bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove distinctive System trade dress, color schemes and architectural features. You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility.

13.2    **Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Sales accruing while the Facility is identified as a "Super 8 Motel", including the System Assessment Fees for so long as the Facility receives service from the Reservation System. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may notify third parties that the Facility is no longer associated with the Chain. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility, and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

13.3    **Advance Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4    **Survival of Certain Provisions.** Sections 3.8 (as to audits, for 2 years after termination), 3.13, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

14.    <u>Your Representations and Warranties.</u>   The parties disclaim making or relying upon any representation, promise, covenant, or warranty, express or implied, oral or written, except as expressly stated in this Agreement. You expressly represent and warrant to us as follows:

14.1    **Quiet Enjoyment and Financing.** You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your

14

performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2    **This Transaction.** You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. No executory franchise, license or affiliation agreement for the Facility exists other than this Agreement. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the Franchise Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement. To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of the Treasury's Office of Foreign Assets Control, or otherwise.

14.3    **No Misrepresentations or Implied Covenants.** All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

## 15.    Proprietary Rights.

15.1    **Marks and System.** You will not acquire any interest in or right to use the System or Marks except under this Agreement. You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2    **Inurements.** All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit. No good will shall attach to any secondary designator that you use.

15.3    **Other Locations and Systems.** We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing

modified System Standards and (iii) a Chain Facility at or for any location outside the Protected Territory. You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks. We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4   **Confidential Information.** You will take all appropriate actions to preserve the confidentiality of all Confidential Information. Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement. You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software). You will use Confidential Information only for the Facility and to perform under this Agreement. Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended. Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years. We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5   **Litigation.** You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware. We alone handle disputes with third parties concerning use of all or any part of the System. You will cooperate with our efforts to resolve these disputes. We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

15.6   **The Internet.** You may use the Internet to market the Facility subject to this Agreement and System Standards. You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark without our consent. You will assign to us any such identification at our request without compensation or consideration. You must make available through the Reservation System and the Chain website all rates you offer to the general public via Internet marketing arrangements with third parties. You must participate in the Chain's best available rate on the Internet guarantee or successor program. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

16.   <u>Relationship of Parties.</u>

16.1   **Independence.** You are an independent contractor. You are not our legal representative or

16

agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2   **Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

## 17. Legal Matters.

17.1   **Partial Invalidity.** If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect. If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2   **Waivers, Modifications and Approvals.** If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel. All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3   **Notices.** Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, or (iii) by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party (x) at its address stated below or as it may otherwise designate by notice, or (y) by such other means as to result in actual or constructive receipt by the person or office holder designated below. The parties may also communicate via electronic mail between addresses to be established by notice. You consent to receive electronic mail from us. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

Super 8 Motels, Inc.:
Our address: 1 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278
Attention: Vice President-Franchise Administration
Fax No. (973) 496-5359

Your name: Riverwalk Alamo Hospitality, LLC,
Your address: 46 Summer Hill Rd., Wayne, NJ 07470,
Attention: Rajiv Mehta;
Your fax No.: 973-686-1828.

17.4   **Remedies.** Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity. The non-prevailing party will pay all costs and expenses,

SUPEXCI
166087 8/99

including reasonable attorney's fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

17.5  **Miscellaneous.**  This Agreement is exclusively for the benefit of the parties.  There are no third party beneficiaries.  No agreement between us and anyone else is for your benefit.  The section headings in this Agreement are for convenience of reference only.

**17.6  Choice of Law; Venue; Dispute Resolution.**

17.6.1  This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles.  The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

17.6.2  The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives.  If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation.  Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc.  We will provide you with the contact address for that organization.  The mediation will be conducted by a mutually acceptable and neutral third party.  If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3  You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

17.6.4  **WAIVER OF JURY TRIAL.  THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE FRANCHISOR, THE FRANCHISEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

17.7  **Special Acknowledgments.**  You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.

17.7.1  You received our Uniform Franchise Offering Circular ("UFOC") for prospective franchisees at least 10 business days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us.  You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.

17.7.2  Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.

17.7.3  This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.

17.7.4  You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the

Facility except as stated ██ Item 19 of the UFOC or in a writ██ that is attached to this Agreement.

17.7.5  You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.

SUPEXC-1
166087 B04

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

WE:
SUPER 8 MOTELS, INC.

By: _____          Attest: _____
Richard Saltzman                                  Assistant Secretary
Vice-President
Franchise Administration

YOU, as Franchisee:
RIVERWALK ALAMO HOSPITALITY, LLC

By: _____          Witness: _____
Manager

20

## APPENDIX A

## DEFINITIONS

Advertising and Reservation Fund or "the Fund" means The Super 8 Advertising and Reservation Fund into which System Assessment Fees are paid. The Fund is under our exclusive control, and shall be used by us for funding and administering, in our sole discretion, the reservation system, the training school, national and international directories, print and broadcast media advertising, technical and professional advice, consultation and services in connection with advertising, employment of personnel and office expenses for the administration of the Fund, advertising agency commissions, and other advertising or promotional programs we establish to promote the Chain.

Agreement means this Franchise Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Fee means the fee we charge for your attendance at a conference for Chain Facilities and their franchisees when and if held.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Rules of Operation Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

Directory means the general purpose directory we publish listing the names and addresses of Chain

21

Facilities, and at our discretion, other Super 8 Motels and Super Suites facilities located outside the United States, Canada and Mexico.

Effective Date means the date that you first take possession of the Facility.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing at the Location on the Effective Date or afterwards.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Gross Room Sales means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

22

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

License Year means:

    (i) *If the Opening Date occurs on the first day of a month*: the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period; or

    (ii) *If the Opening Date does not occur on the first day of a month*: the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at 1614 St. Mary's St. North, San Antonio, TX 78215, as more fully described in Schedule A.

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20.00 on the Effective Date) if the drawee dishonors any check that you submit to us.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Super 8 Motel" and other marks (U.S. Reg. Nos.: 992,721; 1,691,852; 1,686,653; 1,706,143; 1,602,723; 1,343,591, and 1,768,824) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

23

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Protected Territory means an area within a circle created by a 1/2 (one half) mile radius whose centerpoint is the front door of the Facility.

Punch List means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3.

Recurring Fees means fees paid to us on a periodic basis, including without limitation, Royalties, System Assessment Fees, and other reservation fees and charges as stated in Section 7.

Relicense Fee means the fee your transferee or you pay to us under Section 7 when a Transfer occurs.

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Royalty means the monthly fee you pay to us for use of the System under Section 7.1.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

24

**Service Interruption Fee** means the fee you pay us when we suspend Central Reservation System service because you default under this Agreement, in the amount specified in Schedule C.

**System** means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following:  (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

**System Assessment Fee** means the aggregate of all fees charged under Section 7.1.2 to pay for the cost of the System's marketing, advertising, Reservation System, training and other services.

**System Standards** means the standards for the participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

**System Standards Manual** means the Rules of Operations Manual, the Trademark Identification Standards Manual and any other manual we publish or distribute specifying the System Standards.

**Taxes** means the amounts payable under Section 7.2 of this Agreement.

**Technology Standards** means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

**Term** means the period of time during which this Agreement shall be in effect, as stated in Section 5.

**Termination** means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement.

**Transfer** means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility.  A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

**"You" and "Your"** means and refers to the party named as franchisee identified in the first paragraph of this Agreement and its Permitted Transferees.

**"We", "Our" and "Us"** means and refers to Super 8 Motels, Inc., a South Dakota corporation, its successors and assigns.

25

# SCHEDULE A

## (Legal Description of Facility)

26

Exhibit "A"

STATE OF TEXAS                                          JOB NO. 94584

COUNTY OF BEXAR                                         PAGE 1 OF 2

FIELDNOTE DESCRIPTION of 0.981 of an acre of land or 42,717 square feet of land area situated in Block 13 of N.C.B. 999 in San Antonio, Bexar County, Texas. Said 0.981 of an acre of land being all that certain tract of land described in a deed dated May 4, 2000 to Regency Motor Inn Partnership of record in Vol. 8398 Pg. 217, Real Property Records of Bexar County, Texas. Said 0.981 of an acre of land surveyed by R.P. Shelley, R.P.L.S. on Sept. 30, 1994 and updated by SIGHTLINE SURVEYING INC. on January 5, 2005 and is more particularly described by metes and bounds as follows:

BEGINNING at a ½ inch iron rod set at the point of intersection of the Southerly right of way line of Interstate Highway No. 35 (variable width right of way at this point) with the Northeasterly line of North St. Mary's Street (55.6 feet wide right of way), same being the Southwesterly line of said N.C.B. 999 and the Southwesterly line of the remaining portion of Lot 1 of said N.C.B. 999, same being the most Westerly, Northwest corner of said 0.981 acre tract of land;

THENCE with the Southerly line of said Interstate Highway No. 35, same being the irregular Northerly line of said 0.981 of an acre tract of land and crossing said Lot 1 and Lots 7, 8 and 9 of said N.C.B. 999, and being along or near a fence, the following four courses:

1.   North 21d 58' 30" East for a distance of 31.00 feet to a P.K. nail set in concrete at an angle point;
2.   North 56d 16' 27" East (Bearing Basis for this survey per Vol. 4563 Pg. 372) for a distance of 109.04 feet to a ½ inch iron rod found at an angle point;
3.   North 81d 32' 19" East for a distance of 175.43 feet to a ½ inch iron rod set at an angle point;
4.   South 78d 08' 37" East for a distance of 56.62 feet to a ½ inch iron rod set in the Southwesterly line of Mc Lane Ave. (55.6 foot wide right of way), same being the most Northerly, Northeasterly corner of said 0.981 acre tract of land;

THENCE with the Southwesterly line of said Mc Lane Ave. and crossing said Lot 9 with a Southwesterly line of said 0.981 of an acre tract of land, South 33d 34' 02" East for a distance of 37.97 feet to a ½ inch iron rod set for the most Easterly corner of said Lot 9 and said 0.981 of an acre tract of land, same being the most Northerly corner of Lot 10 of said N.C.B. 999 and that certain tract of land designated Tracdt 5 and described in a deed dated Feb.3, 1999 to Diane Lander Lewallen of record in Vol. 5564, Pg. 708, Real Property Records of Bexar County, Texas;

THENCE with the common line between said Lot 9 and said Lot 10, same being a Southeasterly line of said 0.981 of an acre tract of land and the Northwesterly line of said Lewallen tract of land, South 56d 15' 47" West for a distance of 166.59 feet to a point for corner and being the most Westerly corner of said Lewallen tract of land and the common corner of said Lots 9 and 10 and Lots 3 and 4 of said N.C.B. 999;

Job No. 94584
0.981 Acre
Jan. 5, 2005
Page 2 of 2

THENCE with the common line between said Lots 4 and 10, same being along the Southwesterly line of said Lewallen tract of land, same being a Southeasterly line of said 0.981 of an acre tract of land, South 33d 34' 19" East for a distance of 9.50 feet to a point for corner and being the most Northerly corner of a tract of land shown to be in the name of Housing and Comm. Svcs. Inc. per the Bexar County Appraisal District;

THENCE crossing said Lot 4 with the common line between said Housing and Comm. Svcs. Inc. tract of land and said 0.981 of an acre tract of land and being along or near a fence, South 56d 15' 47" West for a distance of 166.59 feet to a point for corner in the Northeasterly line of said St. Mary's Street at the most Westerly corner of said Housing and Comm. Svcs. Inc tract of land, same being the most Southerly corner of said 0.981 of an acre tract of land and from which a ½ inch iron rod found bears North 05d 56' 22" East a distance of 0.40 of an foot;

THENCE with the Northeasterly line of said St. Mary's Street, same being the Southwesterly line of said N.C.B.999 and said Lots 1 through 4, being in part along or near a fence, North 33d 34' 28" West for a distance of 145.38 feet to the POINT OF BEGINNING and containing 0.981 of an acre of land or 42,717 square feet of land area within these metes and bounds. NOTE - There is a Map of Survey this day made to accompany this metes and bounds description.
Surveyed By:

R. P. Shelley, Texas Registered Professional Land Surveyor No. 4540        5 JAN 2005

_____                                   Date

SIGHTLINE SURVEYING INC.
1777 N.E. Loop 410 Suite 600
San Antonio, Texas 78217
(210) 841 5724

Doc# 20050038425 Fees: $28.00
02/23/2005   2:52PM  # Pages 7
Filed & Recorded in the Official Public
Records of  BEXAR COUNTY
GERRY RICKHOFF COUNTY CLERK



FEB 2 3 2005

COUNTY CLERK BEXAR COUNTY, TEXAS

## SCHEDULE B

PART I:      YOUR OWNERS: .

| Name | Ownership Percentage | Type of Equity Interest |
| --- | --- | --- |
| Rajiv Mehta | 21.00% | Member |
| Numesh Desai | 28.00% | Member |
| Kumud Mehta | 19.00% | Member |
| Priti Shah | 16.00% | Member |
| Alpa Shah | 8.00% | Member |
| Samir Desai | 8.00% | Member |

PART II:      THE FACILITY:

Primary designation of Facility: Super 8 Motel

Number of approved guest rooms: 62.

Parking facilities (number of spaces, description): 65.

Other amenities and facilities: 2 floors with exterior corridors and outdoor pool.

PART III:      DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE
COMPLETED AS THE IMPROVEMENT OBLIGATION:

**[Punch List to be attached.]**

27



### FRANCHISOR: SUPER 8 MOTELS, INC.

### "SCHEDULE B PART III"
### PUNCHLIST FOR CHANGE OF OWNERSHIP
### DECEMBER 21, 2004
### (Revised December 29, 2004)

| FACILITY | TIER | GUESTROOMS |
|---|---|---|
| Super 8 Motel #02942 | Motel | 62 |
| 1614 N. St. Mary's Street | | |
| San Antonio, Texas 78204 | | |

**OWNER/APPLICANT**
Rajiv Mehta
(973) 332-8797

**FRANCHISE RETENTION**
Glenn Bishing
(973) 496-2858

**Q.A. REPRESENTATIVE**
Robby Witcher

### PROPERTY CONDITION SUMMARY

This 36-year old former Knights Inn (site #2942) is two-story, single and double-loaded, exterior corridor, constructed of concrete block with a pitched roof and stucco façade. Upgrades will be required on the building exteriors, public areas and guestrooms to comply with System Standards. Landscaping upgrades will be required to enhance the property's curb appeal.

The property is located off of I-35 (southbound 157B, northbound 157C) near downtown. Competition includes Ramada Limited, Motel 6 and Best Western. The market consists of leisure (60%) and commercial (40%) clientele.

*R. N. Mehta*

INITIAL
HERE

2

Super 8 Motel #02942
San Antonio, Texas

| | EXISTING | STANDARD |
|---|---|---|
| Lobby Dimensions: | 725 SF | 220 SF |
| Guestroom Dimensions: | 300 SF (42) | 288 SF |
| | 252 SF (20) | |

## COMPLETION TIME

All items listed in this punchlist must be completed within the noted time frames.

This Punchlist may contain approved time extensions granted for the purpose of completing specific upgrades or projects required for compliance with the Rules of Operation and Design Manual for Super 8 Motels, Inc. Failure to comply with time extension deadlines may result in immediate reservation restriction and default under your franchise agreement.

INITIAL
HERE

3

Super 8 Motel #02942
San Antonio, Texas

> *All Super 8 Motels are required to be in compliance with all items outlined in the Rules of Operation and Design Manual. Following is a partial, but by no means complete, listing. Immediate compliance is required unless otherwise noted within the body of the punchlist.*

- All new General Managers are required to complete management training. It is strongly recommended that this take place prior to opening as a Super 8 Motel, but in no event may it be postponed any longer than 90 days after the opening date.
- All first time Super 8 Motel franchisees are required to attend an orientation program.
- Super 8 Motel exterior signage per System Standards.
- Dumpster enclosure to conceal from guests' view is required.
- Landscape upgrades that are professionally designed and executed and approved in advance by the franchisor.
- A SUPER 8 MOTEL showcase in lobby area
- Each Super 8 Motel is required to provide at a minimum, a complimentary continental breakfast per System Standards.
- A portable phone at the front desk for manager's use.
- A gas detection system must be installed in each area where gas appliances exist in the property.
- Facilities to assist the handicapped in accordance with Local, State and Federal codes, regulations and ordinances.
- Stairwell(s) and corridor(s) must be equipped with emergency and exit lighting with a backup power source.
- Super 8 Motels, Inc. does not allow restaurant or lounge facilities. Restaurant/lounge space must be renovated for alternative use.
- A Company approved Property Management System (PMS) is required.
- Electronic locks meeting System Standards are to be installed all guestroom entrance doors.
- Hardwired smoke detectors with a backup system are required. This system may be a battery within the unit or a generator system that is capable of restoring electrical service in case of an outage.
- A safety guard lock (loop bar or chain) or other non-keyed locking device is required.
- Install a self-closing device on all interior guestroom entrance doors.
- A one-way viewer in all guestroom entrance doors.
- A one way, doorknob latch set and a separate, non-keyed, 1" deadbolt lock on all connecting room doors. Operating knobs must be located on room side only with flush plates on inside of doors.
- A minimum of one glass front, framed picture per headboard, two in a King bedded room is required. Minimum size required is 20" x 16".
- Minimum 25", remote control televisions are required.
- A solid wood or upholstered (vinyl not acceptable) luggage bench or wood or metal folding luggage rack is required.

*Jo. n. Mulla*

INITIAL
HERE

4

Super 8 Motel #02942
San Antonio, Texas

---

**In addition, the following renovations are required for this site:**

- A GFCI (Ground Fault Circuit Interrupter) outlet in vanity areas.
- A minimum of 60% of guestrooms must be prepared and designated as non-smoking rooms.
- Company requires that all properties maintain housekeeping at the highest levels.

---

## IMMEDIATE COMPLIANCE

All Super 8 motels are required to provide either SuperStart® or SuperStart® PLUS breakfast service. The breakfast must be presented using quality foods, utensils and display equipment in a tasteful and sanitary manner as specified throughout this section. State and local health codes as well as ease of accessibility (ADA) must prevail at all times. All breakfast items must be provided with no charge to the guest.

### Requirements

1.  The selected breakfast option must be complimentary for each registered Super 8 Motel guest.

2.  The selected breakfast option must be available for a minimum of 3 consecutive hours between the hours of 6 a.m. and 10 a.m., seven days a week, 365 days per year.

3.  Serving hours should be increased to meet occupancy demands.

4.  Serving hours must be posted in the breakfast area.

5.  The individual Super 8 Motel operator must ensure compliance with local health and sanitation requirements.

6.  Breakfast quantities must be sufficient based on the previous night's occupancy. Sufficient staff must be available to ensure proper replenishment and guest satisfaction.

7.  Each breakfast selection must be presented in an attractive, clean, professional, appetizing and neat manner.

*K. m. martin*

INITIAL
HERE

5

Super 8 Motel #02942
San Antonio, Texas

---

## IMMEDIATE COMPLIANCE CONTINUED

8.    The Super 8 Motel operator is required to list the selected breakfast option as part of the property listing in the Super 8 International Directory. If the operator does not select the breakfast option, the Company will select the SuperStart® breakfast offering requirement. Changes to the breakfast tier offered may not be made between directory cycles.

9.    An area should be set-aside in the lobby, properly furnished, for the breakfast offering. An adjacent hospitality/breakfast area is recommended.

10.    Any deviation from the breakfast standard must be approved in writing by the Company.



### *SuperStart®*

A.    Breakfast Requirements:

    1.    Coffee Requirements:
- Fresh brewed regular coffee; and
- Fresh brewed decaffeinated coffee

    2.    Juice Requirements:
- 100% orange juice – individual 6.75 oz containers, machine dispenser or pitcher with ice tube permitted

    3.    Tea Requirements:
- Tea bags, regular and decaffeinated
- Hot water

    4.    Beverage Options Available in Addition to Coffee, Tea and Juice
- Hot Chocolate · individual packets
- Apple juice may be provided in addition to orange juice, individual 6.75 oz containers, machine dispenser or pitcher with ice tube permitted·
- Milk – individual ½ pint or pint containers of 2%, whole and/or premixed chocolate milk

*R. W. Hall*

INITIAL
HERE

6

Super 8 Motel #02942
San Antonio, Texas

**IMMEDIATE COMPLIANCE CONTINUED**

5.   Beverage Condiment / Supply Requirements:
   - Creamers: portion controlled half & half creamers and a portion controlled non-dairy creamer. Shelf stable half & half is acceptable. Flavored creamers in addition to regular creamers are acceptable.
   - Sugar – individual packets
   - Sugar substitute – individual packets; examples includes Sweet & Low®, Equal®, Splenda® etc.
   - Stir sticks – wooden or plastic; spoons are an acceptable alternative
   - Napkins – individual, minimum cocktail size (4" minimum)
   - Coffee cups – minimum 8 oz disposable. Coffee cups may be used for dispensed juice. Disposable juice cups, minimum 4 oz capacity, wax, plastic or foam, are an acceptable addition to the coffee cup.
   - Coffee cup lids

   Note, both regular and decaffeinated coffee standing in excess of one hour must be provided in airpots, otherwise brewed fresh regularly. Additionally, instant coffee, coffee bags and/or liquid coffee concentrate are not permitted.

B.   Food Requirements:

   1.   Two Baked Goods to be chosen from:
      a.   One non-sweet – Bagels, English Muffins, or Corn or Bran Muffins to be served with:
         -   Butter or margarine, portion controlled (PC), individually wrapped; and,
      b.   One sweet – Danish, Blueberry Muffins, Sweet Rolls or Donuts
      c.   Minimum 5", round disposable plates and disposable knives required with this option.
      d.   Existing properties may provide two types of Breakfast Bars; examples include Kellogg's® Nutri-grain® Bars, Kellogg's® Special K® Bars, Kellogg's® Pop-Tarts®, etc., due to space limitations. A waiver is required for this option.

   2.   Food Options Available in Addition to Above:
      -   Peanut Butter – individual serving packets
      -   Honey – individual serving packets
      -   One seasonal, hand held fresh fruit, such as bananas, apples or oranges

*Jc·N·Nella*

INITIAL
HERE

7

Super 8 Motel #02942
San Antonio, Texas

> ## IMMEDIATE COMPLIANCE CONTINUED

C.    Equipment Requirements:

1.    SuperStart® wall sign

2.    Beverages:

    a.    Coffee and Tea must be provided in one of three ways:

        1.    Airpots – 4 total: two regular, one decaf and one hot water in an airpot rack with appropriate tags to identify contents.

        2.    Carafes – 4 total: two regular, one decaf and one hot water with appropriate tags to identify contents.

        3.    Minimum three burner coffee machine, with or without plumbing, UL approved with auto-shutoff feature. Minimum of three pots, one pot for regular, one pot for decaf and one pot for hot water

        4.    Fresh brewed, single serve machine with regular, decaf and hot water options.

    b.    Juice must be provided in one of four ways:

        1.    One or two valve juice dispenser, depending on number of juices provided

        2.    Carafes – to pour dispensed product where dispenser is installed in back of house

        3.    Tabletop chiller – for juice boxes or carafes. Chiller may be a 10" diameter white or black round plastic tub 8" high or a 13" diameter aluminum display tub with silver wire stand.

        4.    Pitcher with ice tube, 3.3 liter with smooth sides for juice if dispenser, carafes or individual containers not used

    c.    Tea bags must be provided in 3" x 6" x 2" silver basket.

    d.    Milk, ½ pint or pint option, must be provided in tabletop chiller and may share juice chiller. Chiller may be a 10 " diameter white or black round plastic tub 8" high or 13" diameter aluminum display tub with silver wire stand. The same chiller may be used for both juice boxes and milk cartons.

3.    Foods:

    a.    Medium 3-tier silver basket for Breakfast Bar option

    b.    3 –tier 6"L x 8"D x 24-1/2"H silver wire basket display with 3 glass ½ gallon Hex canisters 5" diameter x 8-1/8"H with metal covers for sugars, stirrers, creamers, etc.

    c.    One 2-tier silver 12" round display with two plates and two dome covers for baked goods option. Dome covers are optional if individually wrapped baked good items are provided.

*Jc · ir · melle*

INITIAL
HERE

8

Super 8 Motel #02942
San Antonio, Texas

## IMMEDIATE COMPLIANCE CONTINUED

d. Clear 9" long tongs for baked goods option unless prohibited by local codes, at which time wax paper tissues must be provided

e. 2-tier silver platter display with 12" round clear acrylic discs for hand held fruit if provided

f. Disposable trays, not paper or cardboard, optional

g. One commercial grade bagel slicer, such as Bagel Biter™, optional

D. Other:

a. Coordinating décor, may include silk flowers, plants, artwork, etc.

b. Coordinated trash receptacle, lid recommended

c. Disposable gloves required

d. Other display equipment than the silver wire basket motif may be used with prior written approval



### SuperStart® PLUS

A. Beverage Requirements:

1. Coffee Requirements:
   - Fresh brewed regular coffee; and,
   - Fresh brewed decaffeinated coffee

2. Juice Requirements:
   - 100% orange juice – individual 6.75 oz containers, machine dispenser or pitcher with ice tube permitted; and,
   - Apple juice – individual 6.75 oz containers, dispenser type or pitcher with ice tube permitted

3. Tea Requirements:
   - Tea bags, regular and decaffeinated
   - Hot water

4. Milk Requirements:
   - Minimum 2% Milk; or,
   - Whole and skim milk are both required if used in place of 2% milk

*Jc. m. Nelle*

INITIAL HERE

9

Super 8 Motel #02942
San Antonio, Texas

### IMMEDIATE COMPLIANCE CONTINUED

- Individual ½ pint or pint containers or large volume containers where milk is machine dispensed or served in a pitcher with ice tube

5. Beverage Options Available in Addition to Coffee, Tea, Juice and Milk:
   - Hot Chocolate – individual packets
   - One additional fruit juice, such as pineapple, cranberry, grape, etc., in individual 6.75oz containers, dispenser or pitcher with ice tube
   - Premixed chocolate milk, in individual ½ pint or pint containers or large volume containers where milk is machine dispensed or served in a pitcher with ice tube

6. Beverage Condiment/Supply Requirements:
   - Creamers: portion controlled half & half creamers and a portion controlled non-dairy creamer. Shelf stable half and half is acceptable. Flavored creamers in addition to regular creamers are acceptable.
   - Sugar - individual packets
   - Sugar substitute – individual packets; examples includes Sweet & Low®, Equal®, Splenda® etc.
   - Stir sticks - wooden or plastic; spoons are an acceptable alternative
   - Napkins – individual, minimum cocktail size (4" square)
   - Disposable coffee cups - minimum 8 oz. Coffee cups may be used for dispensed juice. Disposable juice cups, minimum 4 oz capacity, wax, plastic or foam, are an acceptable addition to the coffee cup.
   - Coffee cup lids

   Note, both regular and decaffeinated coffee standing in excess of one hour must be provided in airpots, otherwise brewed fresh regularly. Additionally, instant coffee, coffee bags and/or liquid coffee concentrate are not permitted.

B. Food Requirements:

   1. Ready-to-eat hot and cold cereals required:
      a. Instant oatmeal, such as Quaker® Instant Oatmeal
      b. Assorted cereal bowl packs or a minimum of 2 types of nationally recognized branded bulk cereal to be chosen from:
         - 1 Adult Type – Examples include Kellogg's Raisin Bran®, Kellogg's Special K®
         - 1 Kids Type – Examples include Kellogg's Frosted Flakes® or Kellogg's Fruit Loops®
         - Minimum 6-inch, round disposable bowls (if bowl packs not used) and disposable soup spoons

INITIAL
HERE

10

Super 8 Motel #02942
San Antonio, Texas

## IMMEDIATE COMPLIANCE CONTINUED

2. Two baked goods required and to be chosen from:
   a. One non-sweet – White and Wheat Bread, Bagel or English Muffin with
      * Butter or margarine, portion controlled (PC), individually wrapped
      * 2 Breakfast spreads, jam or jelly and cream cheese (if bagel option chosen), individual servings
   b. One sweet – Danish, Blueberry Muffins, Sweet Rolls or Donuts
   c. Minimum 5", round disposable plates and disposable knives

3. Two seasonal, hand held fresh fruits, such as bananas, apples, oranges, grapes, peaches, pears, etc. required.

4. Food Options Available in addition to Above:
   a. Peanut Butter – individual serving packets
   b. Honey – individual serving packets
   c. Yogurt – low or fat free is recommended

C. Equipment Requirements:

1. SuperStart® PLUS wall sign

2. Eating and Serving Utensils:
   a. Disposable forks, soup spoons and knives
   b. Two 9" long clear tongs unless prohibited by local codes, at which time wax paper tissues must be provided

3. Beverages:
   a. Coffee must be provided in one of three ways:
      1. Airpots – 4 total: two regular, one decaf and one hot water in an airpot rack with magnetic tags to identify contents.
      2. Carafes - 4 total: two regular, one decaf and one hot water with appropriate tags to identify contents
      3. Minimum three burner coffee machine, with or without plumbing, UL approved with auto-shutoff feature. Minimum of three pots, one pot for regular, one pot for decaf and one pot for hot water
      4. Fresh brewed, single serve machine with regular, decaf and tea options.
   b. Juice must be provided in one of four ways:
      1. Two-valve juice dispenser

*Jo. N. Mella*

INITIAL
HERE

11

Super 8 Motel #02942
San Antonio, Texas

## IMMEDIATE COMPLIANCE CONTINUED

2.  Carafes – to pour dispensed product where dispenser is installed in back of house

3.  Tabletop chiller · for juice boxes or carafes. Chiller may be black insulated 26" x 18" x 6" ice pan, 19 ½" diameter white or black round plastic tub 8 ½" high; or 13" diameter aluminum display tub with silver wire stand

4.  Pitcher with ice tube, 3.3 liter with smooth sides for juice dispenser, carafes or individual containers not used

   c.  Milk must be provided in one of two ways:

1.  Tabletop chiller – for individual milk cartons. Chiller may be black insulated 26" x 18" x 6" ice pan, 19 ½" diameter white or black round plastic tub 8 ½" high; 16 ½" diameter x 10" high insulated granite icer; or 13" diameter aluminum display tub with silver wire stand. The same chiller may be used for both juice boxes and milk cartons

2.  Dispenser machine, pitcher with ice tube, 3.3 liter with smooth sides, or a refrigerated dispenser, such as CoolMoo™, that meets local codes. ½ gallon or gallon containers on ice is not an acceptable option.

   d.  Tea bags must be provided in a 3" x 6" x 2" silver basket

4.  Foods:

   a.  2-tier silver platter display with 12" round clear acrylic discs for fruit items

   b.  3-tier 6"L x 8"D x 24-1/2"H silver wire basket display with 3 glass ½ gallon Hex canisters 5" diameter x 8-1/8"H with metal covers for sugars, stirrers, creamers, etc.

   c.  Two 6-1/2"L x 6-1/2"W x 5"H silver storage basket for jelly and cream cheese

   d.  Two 4.5" diameter silver utensil holders

   e.  Two 6" x 6" x 2" silver baskets for napkins

   f.  White cold crock dispenser set, 7-1/4" diameter x 7-1/4"H for butter/margarine, cream cheese and diary creamers

   g.  One 6"H clear frosted riser for elevating one of the baked goods display

   h.  Two white oval 14" x 18" x 3" platters for baked goods

   i.  Two clear oval dome platter cover with hinges door, size 14" x 18" for baked goods platter

   j.  Two 9" long clear tongs unless prohibited by local codes, at which time wax paper tissues must be provided

   k.  Toaster – commercial with minimum 2 wide slots

*R. N. Neata*

INITIAL
HERE

12

Super 8 Motel #02942
San Antonio, Texas

## IMMEDIATE COMPLIANCE CONTINUED

      l.    2-tier 15 ¾" x 13 ½" x 17" silver display rack for cereal bowl packs or bulk dispenser for bulk cereals

      m.   One commercial grade bagel slicer, such as Bagel Biter™, optional

      n.    Disposable trays, not paper or cardboard, optional

5.    Other:

      a.    One 31" Apply Spray for cereal rack decoration or other Company approved decor

      b.    One 36" sunflower swag for decoration in front of baked goods or other Company approved décor

      c.    Coordinated trash receptacle with lid

      d.    Disposable rubber or latex gloves

      e.    Coordinating décor; may include silk flowers, plants, artwork, etc.

      f.    Coordinated trash receptacle, lid recommended

      g.    Disposable gloves

      h.    Other display equipment than the silver wire basket motif may be used with prior written approval

## *Breakfast Offering Upgrades*

In addition to the items listed above, each property may provide one additional food item as necessary to meet local marketing needs. The following options are available:

1.    The SuperStart® breakfast tier may provide a toast bar to include white, wheat and rye breads, toaster and additional condiments in individual serving containers; or,

2.    Either SuperStart® or SuperStart®Plus may provide a fresh baked or frozen waffle option with appropriate equipment and condiments in individual serving containers; or,

3.    The SuperStart® PLUS tier may provide microwaveable breakfast sandwiches, such as egg, cheese & bacon, egg, cheese & sausage, etc. A commercial microwave is required with this option; or,

4.    Any other option/addition must receive prior written approval from the Company before being provided by the motel.

*JC or Merlin*

INITIAL
HERE

13

Super 8 Motel #02942
San Antonio, Texas

IMMEDIATE COMPLIANCE CONTINUED

## Furniture and Fixture Requirements

1. Counter size for the SuperStart® tier must be a minimum of 5 ft long (6 ft long recommended), 24" deep (30" depth recommended). Minimum counter size of 6 ft long, 24" deep required for SuperStart for all properties entering the system after January 1, 2005.

2. Counter size for the SuperStart® PLUS tier must be a minimum of 10 ft long (12 ft long recommended), 24" deep (30" depth recommended). Minimum counter size of 12 ft long, 24"deep required for all properties entering the system after January 1, 2005.

3. Seating is required. Café type tables and chairs recommended; banquet or "stacking" type chairs are not permitted. If café chairs are not used, seating must have upholstered seats and backs. Vinyl permitted for breakfast area chairs only. Plastic furniture is not acceptable. Banquet tables are not permitted.

4. If the breakfast area is not a separate room and the area must be provided in a lobby with restricted space, the property must provide the breakfast in a decorated area matching lobby decor and furnishings. Noise levels in the breakfast area should be addressed through the use of dividers, plants and/or doors if possible.

5. Super 8 recommends that the breakfast area be located in a separate breakfast/hospitality area immediately adjacent to the lobby. If a separate area is used, the area should meet the following requirements:
   - Lighting should be controlled in order to produce varied effects at different times of the day (dimmer switches and window coverings are recommended methods).
   - The furnishing, fixtures and equipment must be color coordinated and of subtle tones. Legal Requirements must be observed at all times. The buffet area must be permanent fixture, finished with a solid surface, Formica or tile top and under-the-counter cabinets.
   - Seating area should meet occupancy demands at maximum periods. A minimum of seating equal to 1/4 (one fourth) of the total number of guestrooms. Less seating may be acceptable with prior company approval. Seating must be accessible to persons with disabilities, including persons who use wheelchairs. Please refer to the property's local building code requirements.

*Jt. m. Heller*

INITIAL
HERE

14

Super 8 Motel #02942
San Antonio, Texas

---

### *IMMEDIATE COMPLIANCE CONTINUED*

The decor must be coordinated and pleasing to the eye. The breakfast
room/hospitality area must include a minimum of one 25" color
television with closed captioning operation for all properties opening
after January 1, 2005. 25" television is recommended for existing
properties. It is recommended that the television be turned to an all news
channel when on. A nationally recognized newspaper, such as USA
Today®, is recommended. Silk flowers, wall hangings, wall décor
and/or live plants should be utilized to create a relaxing atmosphere.

---

### *TO BE COMPLETED WITHIN 30 DAYS OF THE NEW LICENSE AGREEMENT CONTINUED*

### *OPERATIONAL REQUIREMENTS:*

1.   Company requires that all properties maintain housekeeping at the highest levels.

2.   Ensure property is in compliance with all items outlined in the Rules of Operation and
     Design Manual for Super 8 Motels, Inc. to include but not be limited to current market
     collateral, staff uniforms, guest convenience and amenity items, guestroom amenities and
     supplies and so on.

---

### *TO BE COMPLETED WITHIN 90 DAYS OF THE NEW LICENSE AGREEMENT*

Property manager is required to be TripRewards certified and property must fully comply
with all TripRewards requirements.

*R. B. Nolte*

INITIAL
HERE

15

Super 8 Motel #02942
San Antonio, Texas

***TO BE COMPLETED WITHIN 120 DAYS OF THE NEW LICENSE AGREEMENT***

## PROPERTY SIGNAGE:

Upgrade property signage to provide approved graphics.  Signage must be purchased from a vendor approved in advance by the franchisor.  Contact Barb Michlitsch at (605) 229-8060 or the Brand Identity Department at (973) 496-5224 for assistance with the following sign issues:

a.   Paint stanchion on hi-rise sign.
b.   Remove "Reader Board" sign.

## PUBLIC AREAS:

1.   Upgrade Lobby/Front desk and breakfast areas to include the following:
     a.   Refinish and paint textured walls to include breakfast room.
     b.   Refinish/stain wood trim on registration desk.
     c.   Replace carpet in breakfast room. Company requires cut pile carpet or level loop with padding. Carpet must be designed for commercial traffic.
     d.   The existing ceiling fans are acceptable if condition is maintained.

2.   Upgrade public restrooms to include the following:
     a.   Replace damaged wall tiles under sink. If tiles cannot be matched a total replacement will be required.
     b.   Paint entrance doors to include trimwork.
     c.   Remove hand soap. Hand soap is not acceptable.

3.   **Upgrade existing breakfast area to include:**
     **At the time of inspection the property provided seating for 6. The installation of additional breakfast seating is required (seating for 15 is required). Contact the Design and Development Department at (973) 496-2522 for assistance.**

4.   Upgrade commercial laundry to include the following:
     a.   Re-paint floor. A non-slip textured paint is required.
     b.   Paint doors/trim.

5.   Re-paint floor in guest laundry. A non-slip textured paint is required.

*JC rr nella*

INITIAL
HERE

16

Super 8 Motel #02942
San Antonio, Texas

---

## TO BE COMPLETED WITHIN 120 DAYS OF THE NEW LICENSE AGREEMENT

---

### GUESTROOMS: (Rooms Inspected): 124, 120, 114, 109, 107, 201, 203, 208

1.   Replace guestroom entrance door plaques with a Super 8 Motel logo'd or generic plaque type.

2.   Upgrade guestrooms to include the following:
     a.   Paint entrance, connecting and bath doors to include trimwork.
     b.   Replace bedsets (mattress and boxsprings) to eliminate all that are stained, sagging or have loss of support as in rooms #124 and #109.
     c.   Replace luggage racks where tarnished as in room #124.

3.   Upgrade bath areas to include the following:
     a.   Refinish and paint textured walls where scuffed as in room #124.
     b.   Paint ceilings where stained as in rooms #120 and #107.
     c.   Replace shower heads where tarnished as in rooms #120 and #109.
     d.   Replace vanity mirrors where de-silvered as in room #120. At a minimum 30" x 30" mirrors are required.

*Jo m moca.*

INITIAL
HERE

17

Super 8 Motel #02942
San Antonio, Texas

**TO BE COMPLETED WITHIN 180 DAYS OF THE NEW LICENSE AGREEMENT**

## PROPERTY EXTERIOR:

1.  **The Design and Development Department must approve all exterior renovation plans prior to commencement of work. Written approval must be obtained from the Design and Development Department for all exterior renovation plans prior to the commencement of work. These plans must be provided by the architect or general contractor. The Company reserves the right to require additional renovations prior to opening if written approval of renovation plans was not obtained, or the actual renovations vary materially from the approved plans. For assistance with design concepts, contact the Design/Development Department at (973) 496-2522. Renovate to include:**
    a.  Construct a porte-cochere at the lobby entrance providing space for a minimum of two vehicles and a bypass lane. The minimum clearing is 14' from the high point of the pavement. Incorporate a Company design feature.
    b.  Paint building exteriors (doors, service doors, trim, backside of property, railings and stairwells). Contact the Design and Development for approved color schemes.
    c.  Professionally clean stucco façade.
    d.  Professionally clean and re-paint walkways and steps.
    e.  Replace stairwell treads where worn or damaged.
    f.  Replace PTAC grills with a matching louver design.

2.  Upgrade parking lot to include the following:
    a.  Reseal and stripe throughout.
    b.  Re-pour damaged concrete sections at entrance.
    c.  Paint curbs and wheel stops.

3.  Landscape upgrades must be professionally designed and executed. Renderings, plans, and contracts must be provided to the Design and Development Department and be approved in writing. Enhance landscaping to include but not limited to the following:
    a.  Install additional landscape beds to include trees, shrubs, seasonal flowers and groundcover concentrating around new porte-cochere and Dumpster enclosure.
    b.  Rework existing beds by eliminating overgrowth and installing additional shrubs, flowers and groundcover concentrating around the property entrance, stairwells, swimming pool and along perimeter fence.

*Jc. o-nelta*

INITIAL
HERE

18

Super 8 Motel #02942
San Antonio, Texas

> **TO BE COMPLETED WITHIN 180 DAYS OF THE NEW LICENSE AGREEMENT CONTINUED**

## PROPERTY EXTERIOR CONTINUED:

4.  Pool was closed at time of inspection. At time of season opening pool area and furniture must meet System Standards. Ensure safety equipment is visible at all times to include the off-season. Prior to 2005 season opening upgrade pool to include the following:
    a.  Professionally clean and paint deck. A non-slip textured paint is required.
    b.  Paint fence. The existing wood fence is acceptable if condition is maintained.
    c.  Replace furniture package. A minimum seating for 8 is required.

## GUESTROOMS:

1.  Replace carpet. Company requires minimum 26-ounce cut pile carpet with padding. Carpet must also be wall to wall.

2.  Upgrade furniture packages to include the following:
    a.  **Replace furniture packages to include leisure chairs where scuffed, worn or damaged as in rooms #114, #109, #201 and #203.** New casegoods are to include a minimum of one credenza/armoire', a framed wall mirror, one headboard per bed, one freestanding nightstand in rooms with two beds and rooms with one bed smaller than a king, and two freestanding nightstands in room with a king bed. A minimum of one writing surface is required to consist of either a writing desk or an activity table. Two chairs (minimum one with arms) per room are required. Chairs must be fabric covered.
    b.  Replace leisure and desk chairs and recliners where worn or stained as in rooms #124 and #120.

*R. N. Noble*

INITIAL
HERE

19

Super 8 Motel #02942
San Antonio, Texas

HANDWRITTEN OR UNAUTHORIZED REVISIONS TO THIS PUNCHLIST ARE NOT
VALID AND DO NOT BIND THE FRANCHISOR. ANY AND ALL REVISIONS TO THIS
PUNCHLIST MUST BE MADE AND APPROVED BY THE FRANCHISOR'S QUALITY
ASSURANCE DEPARTMENT.

This Punchlist identifies items that require action due to meet the Franchisor's standards. The
Franchisor does not warrant that completion of the items on this Punchlist will cause the
converting facility to be in compliance with any applicable federal, state, local codes, ordinances
or regulations. You (and your architect, contractor and engineer, if applicable) are solely
responsible for conforming the facility to the requirements of federal, state and local codes,
ordinances and regulations that may apply to your site.

This Punchlist has been prepared on the basis of a random sample inspection of the Facility on
the date specified. The owner is responsible for meeting all Franchisor Standards. All repairs,
replacements and improvements must cause the item to meet or exceed the Franchisor's standards
published in the Standards of Operation and Design Manual.

This Punchlist will be subject to revision at the discretion of the Franchisor if the condition of the
facility changes materially or the License (Franchise) Agreement to which this is attached is
executed more than 90 days after the date of the Punchlist. Note that ordinary wear and tear,
particularly during busy seasons, may result in the need for additional work to meet entry
standards of the Franchisor.

**This Punchlist is subject to revision by the Franchise Review Committee and should not
be considered to be final until the License Agreement for the inspected facility is executed
by the Company.**

**NOTE:** Any item on this Punchlist that is not required to be completed prior to the new license
agreement will continue to be evaluated for appearance and condition during all Quality
Assurance inspections conducted before the date when completion is required.

**This punchlist was revised on December 29, 2004. All previous copies are invalid.**

1.      revised on 12/29/04 by: ks

02942 CO SUP
dg/hh

*JC · N · Merla*

INITIAL
HERE

SUPER 8 MOTELS, INC.
SCHEDULE C
August 2004

System Assessment Fee

The System Assessment Fee is equal to three percent (3%) of Gross Room Sales, and is paid into the Advertising and Reservation Fund. The System Assessment Fee is a recurring, non-refundable payment. All or any part of Fund proceeds received during an accounting period need not be disbursed within that accounting period. Notwithstanding the above, we may increase the System Assessment Fee you pay upon 60 days advance written notice, effective at any time on or after the tenth (10th) anniversary of the Effective Date of this Agreement, as part of a Chain-wide increase in System Assessment Fees we implement in our sole discretion to cover costs (including reasonable direct or indirect overhead costs) related to such services and programs. We may increase System Assessment Fees on a Chain-wide basis before the tenth anniversary of the Effective Date but such Fees will not begin to accrue at the increased rate until the tenth anniversary of the Effective Date.

Additional Fees

A.      Mandatory Marketing Program Charge

We charge a Mandatory Marketing Program Charge for your participation in the TripRewards® or successor guest loyalty program. Under TripRewards, program members staying at qualifying rates at Chain Facilities earn their choice of TripRewards points, airline miles or other program currency. TripRewards points are redeemable for free stays at Chain Facilities and for travel, merchandise, entertainment and other awards. The Mandatory Marketing Program Charge is up to 5% of the Gross Room Sales accruing from each qualifying stay at the Facility. We will proactively match and award members with points or other program currency they earn on qualified stays even if they do not present their TripRewards membership card upon check-in. You will be billed monthly in arrears for qualifying stays by program members during the preceding month.

B.      GDS and Internet Booking Fees

We will charge you under our Central Commission Payment Program either a GDS Fee or an Internet Booking Fee for reservations processed through the global distribution systems ("GDS"), including any operated by an affiliate, or the Internet for your Facility. The GDS Fee described in Section 7 is $4.50 per reservation processed through any GDS or through any Internet website powered by a GDS. Internet-originated reservations carry fees of $3.50 per reservation booked through sources other than GDS powered websites or our Chain website. GDS and Internet-originated reservations may also carry a commission if the originator qualifies. If a guest cancels a GDS or Internet-originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable fee.

28

C.  Other Reservation System Charges

Agency and other commissions are typically 10% of the Gross Room Sales generated by each reservation booked by an agency or other qualifying originator, plus our service charge of .75% of commissionable revenue. We may raise the agent commission to up to 15% of Gross Room Sales from time to time for certain Chain-wide promotions, plus our service charge of .75% of commissionable revenue, upon 30 days advance written notice. Such increases will apply only to reservations booked after we announce the increased commission unless we specify otherwise. The general sales agent commission (also known as the international sales office commission) is 15% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office and includes the agency commission.

By accepting reservations from the GDS, Internet, travel agencies and other intermediaries, you agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to intermediaries and retailers on your behalf. You may elect not to receive reservations from either the GDS or Internet websites, other than the Chain's website, by giving us 60 days advance written notice. We will remove the Facility from participation in both channels. However, you must pay all fees and commissions incurred for reservations booked through the GDS or Internet before deactivation. You may reactivate the Facility's listing through such channels once by paying us a reactivation charge of $100.00, after which you may not deactivate again during the Term of your License. Your participation in the GDS and Internet must be for either both or neither distribution channel.

We also charge you an annual website maintenance fee of $36.00 to maintain the Facility's web pages on the Chain's website. We may charge additional fees for creating or modifying the Facility's web pages or performing other services related to Internet marketing.

If we suspend Central Reservation System service because of your default under this Agreement, then you must pay us a Service Interruption Fee of $200 before we restore service.

You must (i) make available through the Central Reservation System and the Chain website room rates equivalent to those offered to the general public by third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements. Beginning May 1, 2004 if a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through the Chain website or the Central Reservation System for the same date and accommodations and the guest meets all Program requirements, you must provide the first room night to the guest without a room charge. You may collect standard incidental fees, charges and taxes. We will also charge you a Processing Fee of $25 to reimburse us for our administrative charges of handling the complaint.

We will offer you the opportunity to participate in certain Internet distribution channel marketing and reservation activity with third parties including our affiliates. Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the distribution channel at its marked-up rate. For providing and managing this activity we may

29

receive commissions from the Internet distribution channels based upon the mark-up or room rates that they receive for renting your rooms. The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues. We will allocate these commissions to Royalties and System Assessment Fees in equal proportions. Under another type of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate. The distribution channel will not mark-up these rates but will charge you a commission of up to 15% on consumed room nights.

We or an affiliate may charge you a sales agent commission of up to 10% of the Gross Room Revenues generated from consumed reservations booked by members of certain affinity groups and organizations at your Facility if you participate in our Member Benefits sales program. We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits program to its members.

D.    Guest Services Assessment

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest. If you do not respond to any complaint within 7 business days after we refer it to you and the guest contacts us again to seek resolution, we will charge you a "Guest Services Assessment" of $75.00, plus the costs we incur to settle the matter with the guest. In addition, if the number of guest complaints per 1,000 occupied roomnights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish, we will charge you a "Processing Fee" of $25.00 for each additional complaint we receive during that year, regardless of whether you are able to resolve it to the guest's satisfaction. We may change or eliminate the Guest Services Assessment, the Processing Fee, the Annual Facility Allotment and/or the time for responding to or resolving a guest complaint on a Chain-wide basis at any time upon 30 days advance notice. The Guest Services Assessment and the Processing Fee are intended only to reimburse us for the costs of complaint handling and are not intended as penalties or liquidated damages. All guest complaints remain subject to indemnification under this Agreement.

We may increase or adjust any of the Additional Fees to cover increases in their allocated costs and may add new fees and charges for new services and programs at any time upon not less than 60 days notice.

30

# EXHIBIT B

## GUARANTY

To induce Super 8 Motels, Inc., its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we", "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

WITNESSES:                                      GUARANTORS:

_____          _____ (Seal)
                                                      Rajiv Mehta

_____          _____ (Seal)
                                                      Nimesh Desai

_____          _____ (Seal)
                                                      Kumud Mehta

_____          _____ (Seal)
                                                      Priti Shah

_____          _____ (Seal)
                                                      Alpa Shah

_____          _____ (Seal)
                                                      Samir Desai

31

SLPEXC1
168173J 8/04

# EXHIBIT C

## AMENDMENT TO FRANCHISE AGREEMENT

THIS "AMENDMENT" is made and entered into as of this _29th_ day of _November_ 2005, ("Amendment Date") by and between **SUPER 8 MOTELS, INC.,** a South Dakota corporation ("we", "us" or "our"), **RIVERWALK ALAMO HOSPITALITY, LLC,** a Texas limited liability company ("you", or "your") and Nimesh Desai, Kumud Mehta, Priti Shah and Samir Desai (the "Guarantors"). This Amendment supplements that certain Franchise Agreement dated **January 7, 2005,** (the "Franchise Agreement"), relating to a license to operate a Super 8® System Unit located at 1614 North St. Mary's Street, San Antonio, TX 78215, designated as Unit #2942-82782 (the "Facility"). To the extent of any conflict between the Franchise Agreement and this Amendment, the Amendment shall control.

IN CONSIDERATION of the mutual agreements herein contained, and promises herein expressed, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties, it is agreed as follows:

1.      Part I of Schedule B to the License Agreement is amended as follows:

PART I:          YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest |
|------|---------------------|------------------------|
| Nimesh Desai | 45% | Member |
| Kumud Mehta | 19% | Member |
| Priti Shah | 16% | Member |
| Samir Desai | 20% | Member |

2.      You agree to execute the attached revised Guaranty, designated as "Exhibit A," in conjunction with the execution of this Amendment.

3.      Confidentiality. You acknowledge that the existence of this Amendment and the granting of the benefits herein are strictly confidential between us and you. Part of the consideration received by us for granting the benefits is your obligation to maintain confidentiality about this Amendment and its benefits. Therefore, you agree not to disclose to any person or entity the existence or subject matter of this Amendment, or the benefits granted hereunder, except under compulsion of law or to attorneys or accountants as needed for assistance with representation of or advice to you. Within your organization, information about this Amendment will be disclosed to agents, officers, affiliates and contractors on a "need to know" basis only. If you violate this confidentiality obligation, no further benefits will be available from that time and thereafter, to the extent that the benefits have not then been fully utilized upon written notice from us.

4.      Release. You, on behalf of yourself, your partners, officers, employees, directors, shareholders, and Guarantor, and the successors and assigns of all of them, hereby release and holds harmless us, our officers, employees, agents, directors, shareholders, and the successors and assigns of all of them from any and all claims and causes of action whatsoever arising prior to and through

the date of this Amendment relating to the offer, sale, negotiation, default, and/or performance of the Franchise Agreement for the Facility.

5.    Except as expressly stated in this Amendment, no further additions, modification or deletions to the Franchise Agreement or the Guaranty Agreement are intended by the parties or made by this Amendment.

6.    Execution in Counterparts.  To facilitate execution of this Agreement by geographically separated parties, this Agreement, and all other agreements and documents to be executed in connection herewith may be executed in as many counterparts as may be required; and it shall not be necessary that the signatures on behalf of each party appear on each counterpart; but it shall be sufficient that the signature on behalf of each party appear on one or more of the counterparts.  All counterparts shall collectively constitute a single agreement.  It shall not be necessary in making proof of this Agreement to produce or account for more than a number of counterparts containing the respective signatures on behalf of all the parties hereto.  All facsimile executions shall be treated as originals for all purposes.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date indicated above:

**SUPER 8 MOTELS, INC.**

Attest: _____    By: _____
(Assistant) Secretary                        Richard M. Saltzman
                                             Vice President
                                             Franchise Administration


**RIVERWALK ALAMO HOSPITALITY, LLC**


Witness: _____    By: _____
                                     Print Name: _____
                                                      Manager

# EXHIBIT D

## EXHIBIT A

### GUARANTY

To induce Super 8 Motels, Inc., its successors and assigns ("you") to sign the Amendment to the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we," "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement.  Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee.  We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

**WITNESSES:**

**GUARANTORS:**

_____ (Seal)
Nimesh Desai

_____ (Seal)
Kumud Mehta

_____ (Seal)
Priti Shah

_____ (Seal)
Samir Desai

# EXHIBIT E

## AMENDMENT TO FRANCHISE AGREEMENT

THIS "AMENDMENT" is made and entered into as of this _28th_ day of _Sept_ , 2006, ("Amendment Date") by and between **SUPER 8 MOTELS, INC.,** a South Dakota corporation ("we", "us" or "our"), **RIVERWALK ALAMO HOSPITALITY, LLC,** a Texas limited liability company ("you", or "your") and Nimesh Desai, Vimi R Mehta, Zarina Wahhab, Kumud Mehta, Samir Mehta and Satish Mody (the "Guarantors") This Amendment supplements that certain Franchise Agreement dated **January 7, 2005**, (the "Franchise Agreement"), relating to a license to operate a Super 8® System Unit located at 1614 St Mary's Street, San Antonio, TX, designated as Unit #2942-82782-04 (the "Facility") To the extent of any conflict between the Franchise Agreement and this Amendment, the Amendment shall control

IN CONSIDERATION of the mutual agreements herein contained, and promises herein expressed, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties, it is agreed as follows

> 1   The Franchise Agreement is hereby amended by striking Part I of Schedule B and replacing it with the following

> PART I      YOUR OWNERS

| Name | Ownership Percentage | Type of Equity Interest |
|------|---------------------|------------------------|
| Kumud Mehta | 45% | Member |
| Nimesh Desai | 20% | Member |
| Samir Desai | 20% | Member |
| Vivek Mehta | 15% | Member |

> 2 The License Agreement is also amended by striking the Guaranty in its entirety and replacing it with the Guaranty attached to this Agreement

3   Confidentiality You acknowledge that the existence of this Amendment and the granting of the benefits herein are strictly confidential between us and you Part of the consideration received by us for granting the benefits is your obligation to maintain confidentiality about this Amendment and its benefits Therefore, you agree not to disclose to any person or entity the existence or subject matter of this Amendment, or the benefits granted hereunder, except under compulsion of law or to attorneys or accountants as needed for assistance with representation of or advice to you Within your organization, information about this Amendment will be disclosed to agents, officers, affiliates and contractors on a "need to know" basis only If you violate this confidentiality obligation, no further benefits will be available from that time and thereafter, to the extent that the benefits have not then been fully utilized upon written notice from us

4   <u>Release</u>   You and Guarantor, on behalf of yourselves, your partners, officers, employees, directors, shareholders, representatives, agents and your successors and assigns, hereby release and hold harmless us, our officers, employees, agents, directors, shareholders, representatives and the predecessors, successors and assigns of all of us, from any and all claims and causes of action whatsoever arising prior to and through the date of this Amendment relating to the offer, sale, negotiation, default, and/or performance of the Franchise Agreement for the Facility

5   Except as expressly stated in this Amendment, no further additions, modification or deletions to the Franchise Agreement or the Guaranty Agreement are intended by the parties or made by this Amendment

6   <u>Execution in Counterparts</u>   To facilitate execution of this Amendment by geographically separated parties, this Amendment, and all other agreements and documents to be executed in connection herewith may be executed in as many counterparts as may be required, and it shall not be necessary that the signatures on behalf of each party appear on each counterpart, but it shall be sufficient that the signature on behalf of each party appear on one or more of the counterparts   All counterparts shall collectively constitute a single agreement   It shall not be necessary in making proof of this Amendment to produce or account for more than a number of counterparts containing the respective signatures on behalf of all the parties hereto All facsimile executions shall be treated as originals for all purposes

remainder of page intentionally left blank

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date indicated above

**DAYS INNS WORLDWIDE, INC.**

Attest _____        By _____
    (Assistant) Secretary                                 Richard M Saltzman
                                             Vice President
                                           Franchise Administration

**RIVERWALK ALAMO HOSPITALITY, LLC**

Witness _Brmehta_        By _____
                                        Managing Member

**GUARANTORS:**

Witness _Brmehta_        By _JC or Nehi._
                                        Kumud Mehta

Witness _Brmehta_        By _____
                                        Nimesh Desai

Witness _Brmehta_        By _____
                                        Samir Desai

Witness _Brmehta_        By _____
                                        Vivek Mehta

# EXHIBIT F

## GUARANTY

To induce Super 8 Motels, Inc., its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments, will be punctually paid and performed

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement   Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee   We waive notice of amendment of the Agreement We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement

**WITNESSES:**                                **GUARANTORS:**

_____        _____ (Seal)
                                                    Kumud Mehta

_____        _____ (Seal)
                                                    Nimesh Desai

_____        _____ (Seal)
                                                    Samir Desai

_____        _____ (Seal)
                                                    Vivek Mehta

# EXHIBIT G

22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 fax (800) 880-9445

May 23, 2016

Mr. Richard Saltzman                                          <u>**VIA 2 DAY DELIVERY METHOD**</u>
Giambrone & Saltzman, LLC
710 US Highway 46E, Suite 210
Fairfield, NJ 07004

RE:   **ACKNOWLEDGEMENT OF TERMINATION** of the Franchise for Super 8® System Unit #02942-82782-04 located in San Antonio, TX (the "Facility")

Dear Mr. Saltzman:

Super 8 Worldwide, Inc., successor in interest to Super 8 Motels, Inc., ("we" or "us") has received your letter, dated April 29, 2016, advising us that on May 31, 2016 (the "Termination Date"), Riverwalk Alamo Hospitality, LLC (the "Franchisee") intends to stop operating the Facility as a Super 8 facility. Accordingly, we acknowledge that the Franchise Agreement, dated January 7, 2005, as amended (the "Agreement") will terminate on the Termination Date.

The Agreement requires the Franchisee to perform certain post-termination obligations. In addition to other obligations specified in the Agreement, by no later than ten (10) days from the Termination Date, the Franchisee must (a) remove all signage and other items bearing the Super 8 Marks; (b) perform all post-termination obligations specified in the Systems Standards Manual; (c) change all signs, billboards, and listings in telephone directories, travel guides, hotel indexes and similar materials in which the Facility is identified as a Super 8 facility; and (d) remove the Super 8 Marks from any advertising or promotional activities on, around or directed towards the Facility, including any web sites, web pages or search engines. The Franchisee must cooperate fully with us regarding any post-termination inspections by us to verify that the Facility has been properly de-identified. The Franchisee must immediately return to us all training documents, operating manuals and other proprietary material.

Because the Agreement is terminating, the Franchisee must pay us Liquidated Damages which are currently estimated to be $148,160.86, as specified in Section 12.1of the Agreement. The Franchisee must also pay any outstanding Recurring Fees and any other fees and charges through the date Franchisee completes the de-identification of the Facility. We estimate that, as of the date of this letter, the Franchisee owes us $217,791.47 in such fees and charges. The Franchisee must pay us this amount within fourteen (14) days. Please consider this letter to be a notice and demand for payment under any Guaranty of the Agreement, directed to your Guarantors.

Please know that, because the Agreement is terminating, the Franchisee will also lose the right to continue to use the seamless interface version of your property management system. The Franchisee must now make arrangements with the software vendor for a new license to use the property management system. If the Facility has WynGuest system installed, please be advised that due to the termination the Franchisee will have no functionality from the system. Should the Franchisee wish to continue using an independent version of the software, the Franchisee should contact Sabre at 877-520-3646. If the Franchisee is planning to migrate to another property management system, the Franchisee may contact the provider to expedite the installation. If the Franchisee would like to inquire about the data maintained in the system, the Franchisee may contact Hotel Technology Client Support at 506-646-2521 to obtain reporting of that data.

    
     

Mr. Richard Saltzman
May 23, 2016
Page Two


Should you have any questions regarding this matter, please contact Charlene Martin, Senior Manager of Settlements, at (973) 753- 7602.

Sincerely,

Suzanne Fenimore
Senior Director
Contracts Compliance

Enclosure

cc:     Vivek Mehta ~ 268 Levingberg Lane, Wayne, NJ 07470 (Site Contact & Guarantor)
        Kumud Mehta (Guarantor)
        Samir Desai (Guarantor)
        Nimesh Desai (Guarantor)
        Mike Mueller
        Charlene Martin
        Robert Kolatac
        Joe Maida
        Michael Piccola
        Jennifer Constantinou

## DE-IDENTIFICATION PROCEDURES

**You must complete each of the following within 10 days after the Termination Date:**

1.    Remove, replace or cover with an opaque cover the primary Facility signage and all other exterior signage bearing the Super 8 Marks.

2.    Remove all interior signage that contains Super 8 Marks.

3.    Change advertising billboards to remove Super 8 Marks, including any department of transportation or other highway signage.

4.    Stop answering Facility telephone as a Super 8 facility.

5.    Remove Super 8 name and Marks from any domain name, advertising and brochures.

6.    Return to us or destroy all confidential operations and training manuals.

7.    Remove the Super 8 name and Marks from the following items:

   - Guestroom supplies including door signage, ice buckets, cups etc.
   - Bathroom supplies including soap, shampoo, conditioner, etc.
   - Business cards and letterhead
   - Registration cards, folios, guest receipts, including electronic copies
   - Guestroom keys
   - Uniforms and name badges

8.    Paint over or remove any distinctive  Super 8 trade dress, paint schemes or architectural features.

9.    Remove Super 8  name from the Facility's listing on TripAdvisor or any other online traveler review site.

10.   It is prohibited to re-name the Facility with a confusingly similar name or color scheme as a Super 8 facility.

11.   We will visit the Facility at any time after 10 days after the Termination Date to verify that you have performed these de-identification obligations.

# ITEMIZED STATEMENT

| As of Date (DD-MMM-YYYY) | : | 23-May-2016 |
|---|---|---|
| Customer No | : | 02942-82782-04-SUP |
| Category Set | : | |
| Category Group | : | |
| Group No | : | |
| Bankruptcy | : | No Bankruptcy Sites |
| Disputed | : | No |
| Finance Charges Included | : | Yes |

| Customer No | : | 02942-82782-04-SUP |
|---|---|---|
| Address | : | 1614 N SAINT MARYS ST,SAN ANTONIO,TX,78215,US |
| As of Date | : | 23-May-2016 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| NOV-2009 | 30353198 | 11/10/2009 | AUDIT ROYALTY | | 8,145.61 | 0.00 | 8,168.45 | 16,314.06 |
| | 30353199 | 11/10/2009 | AUDIT ADVERTISING | | 4,887.37 | 0.00 | 5,636.25 | 10,523.62 |
| | 30355966 | 11/16/2009 | JUNE 2009 NT AUDIT | | 523.40 | 0.00 | 611.75 | 1,135.15 |
| | | | | Sub Total: | 13,556.38 | 0.00 | 14,416.45 | 27,972.83 |
| JUL-2010 | 41475968 | 07/31/2010 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 552.35 | 552.35 |
| | | | | Sub Total: | 0.00 | 0.00 | 552.35 | 552.35 |
| SEP-2010 | 41537730 | 09/30/2010 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 262.83 | 262.83 |
| | 41539174 | 09/30/2010 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 152.94 | 152.94 |
| | | | | Sub Total: | 0.00 | 0.00 | 415.77 | 415.77 |
| OCT-2010 | 41574156 | 10/31/2010 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 165.27 | 165.27 |
| | 41576380 | 10/31/2010 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 275.45 | 275.45 |
| | | | | Sub Total: | 0.00 | 0.00 | 440.72 | 440.72 |
| NOV-2010 | 30508978 | 11/19/2010 | AUDIT ROYALTY | | 575.45 | 0.00 | 555.74 | 1,131.19 |
| | 30508979 | 11/19/2010 | AUDIT ADVERTISING | | 345.27 | 0.00 | 333.45 | 678.72 |
| | 30508981 | 11/19/2010 | AUDIT INTEREST FEE | | 64.92 | 0.00 | 62.73 | 127.65 |
| | | | | Sub Total: | 985.64 | 0.00 | 951.92 | 1,937.56 |
| DEC-2010 | 41642352 | 12/31/2010 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 235.17 | 235.17 |
| | 41642382 | 12/31/2010 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 194.17 | 194.17 |
| | TM0181362 | 12/20/2010 | MEMBER BENEFIT COMM | | 0.00 | 0.00 | 2.43 | 2.43 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | Sub Total: | 0.00 | 0.00 | 431.77 | 431.77 |
| JUL-2011 | 41848128 | 07/31/2011 | 5096A-SOFTHOTEL SW MAINT | | 0.00 | 0.00 | 2.56 | 2.56 |
| | 41866170 | 07/31/2011 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 22.63 | 22.63 |
| | 41867723 | 07/31/2011 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 37.72 | 37.72 |
| | | | | Sub Total: | 0.00 | 0.00 | 62.91 | 62.91 |
| AUG-2011 | 10557491 | 08/11/2011 | GUEST SATISFACTION | | 0.00 | 0.00 | 3.61 | 3.61 |
| | 10557492 | 08/11/2011 | GUEST SRVCS TRANSACTION CHARGE | | 0.00 | 0.00 | 7.68 | 7.68 |
| | 10559514 | 08/18/2011 | GUEST SRVCS TRANSACTION CHARGE | | | | 7.12 | 7.12 |
| | 10561288 | 08/18/2011 | GUEST SRVCS TRANSACTION CHARGE | | 0.00 | 0.00 | 7.12 | 7.12 |
| | 10561290 | 08/18/2011 | GUEST SATISFACTION | | 0.00 | 0.00 | 3.34 | 3.34 |
| | 1233549 | 08/27/2011 | GDS & INTERNET BKGS | | 0.00 | 0.00 | 13.67 | 13.67 |
| | 26203633 | 08/22/2011 | WYNREWARDS BONUS | | 0.00 | 0.00 | 18.70 | 18.70 |
| | 26203898 | 08/22/2011 | WYNREWARDS 5% | | 0.00 | 0.00 | 25.56 | 25.56 |
| | 41881668 | 08/31/2011 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 6.58 | 6.58 |
| | 41884911 | 08/31/2011 | 5096A-SOFTHOTEL SW MAINT | | 0.01 | 0.00 | 12.16 | 12.16 |
| | 41R8K56AR | 08/31/2011 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 132.24 | 132.24 |
| | 41899862 | 08/31/2011 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 79.35 | 79.35 |
| | TA0233549 | 08/27/2011 | T/A COMMISSIONS | | 0.00 | 0.00 | 5.78 | 5.78 |
| | TM0233549 | 08/27/2011 | MEMBER BENEFIT COMM | | 0.00 | 0.00 | 14.53 | 14.53 |
| | | | | Sub Total: | 0.00 | 0.00 | 337.44 | 337.44 |
| SEP-2011 | 10565271 | 09/01/2011 | GUEST SATISFACTION | | 0.00 | 0.00 | 2.82 | 2.82 |
| | 10565272 | 09/01/2011 | GUEST SRVCS TRANSACTION CHARGE | | 0.00 | 0.00 | 6.00 | 6.00 |
| | 10567467 | 09/15/2011 | GUEST SRVCS TRANSACTION CHARGE | | 0.00 | 0.00 | 4.88 | 4.88 |
| | 1241050 | 09/29/2011 | GDS & INTERNET BKGS | | 0.00 | 0.00 | 6.89 | 6.89 |
| | 26208392 | 09/22/2011 | WYNREWARDS 5% | | 0.00 | 0.00 | 11.09 | 11.09 |
| | 26208826 | 09/22/2011 | WYNREWARDS BONUS | | 0.00 | 0.00 | 2.57 | 2.57 |
| | 30622094 | 09/15/2011 | SUPER8 TRAINING | | 0.00 | 0.00 | 4.94 | 4.94 |
| | 41913344 | 09/30/2011 | 5096A-SOFTHOTEL SW MAINT | | 0.00 | 0.00 | 7.73 | 7.73 |
| | 41915870 | 09/30/2011 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 3.98 | 3.98 |
| | 41924445 | 09/30/2011 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 55.43 | 55.43 |
| | 41925197 | 09/30/2011 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 33.26 | 33.26 |
| | TM0241050 | 09/29/2011 | MEMBER BENEFIT COMM | | 0.00 | 0.00 | 6.05 | 6.05 |
| | | | | Sub Total: | 0.00 | 0.00 | 145.64 | 145.64 |
| OCT-2011 | 1248041 | 10/27/2011 | GDS & INTERNET BKGS | | 0.00 | 0.00 | 2.22 | 2.22 |
| | 26209908 | 10/22/2011 | WYNREWARDS 5% | | 0.00 | 0.00 | 2.44 | 2.44 |
| | 41936558 | 10/31/2011 | 5096A-SOFTHOTEL SW MAINT | | 0.00 | 0.00 | 2.52 | 2.52 |
| | 41962131 | 10/31/2011 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 19.01 | 19.01 |
| | 41963184 | 10/31/2011 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 11.41 | 11.41 |
| | | | | Sub Total: | 0.00 | 0.00 | 37.60 | 37.60 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| NOV-2011 | 1254181 | 11/28/2011 | GDS & INTERNET BKGS | | 0.00 | 0.00 | 3.76 | 3.76 |
| | 26215352 | 11/22/2011 | WYNREWARDS 5% | | 0.00 | 0.00 | 9.31 | 9.31 |
| | 41970704 | 11/30/2011 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 4.06 | 4.06 |
| | 41972502 | 11/30/2011 | 5096A-SOFTHOTEL SW MAINT | | 0.00 | 0.00 | 7.90 | 7.90 |
| | 41988617 | 11/30/2011 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 75.78 | 75.78 |
| | 41990066 | 11/30/2011 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 28.15 | 28.15 |
| | TM0254181 | 11/28/2011 | MEMBER BENEFIT COMM | | 0.00 | 0.00 | 4.62 | 4.62 |
| | | | Sub Total: | | 0.00 | 0.00 | 133.58 | 133.58 |
| DEC-2011 | 1260099 | 12/28/2011 | GDS & INTERNET BKGS | | 0.00 | 0.00 | 2.73 | 2.73 |
| | 42007979 | 12/31/2011 | 5096A-SOFTHOTEL SW MAINT | | 0.00 | 0.00 | 7.57 | 7.57 |
| | 42009321 | 12/31/2011 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 3.89 | 3.89 |
| | 42025191 | 12/31/2011 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 54.51 | 54.51 |
| | 42026324 | 12/31/2011 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 32.70 | 32.70 |
| | TM0260099 | 12/28/2011 | MEMBER BENEFIT COMM | | 0.00 | 0.00 | 3.71 | 3.71 |
| | | | Sub Total: | | 0.00 | 0.00 | 105.11 | 105.11 |
| JAN-2012 | 42039696 | 01/31/2012 | 5096A-SOFTHOTEL SW MAINT | | 0.00 | 0.00 | 2.35 | 2.35 |
| | 42053866 | 01/31/2012 | Actual-1000A ROYALTY FEE | | 0.00 | 0.00 | 14.07 | 14.07 |
| | 42055061 | 01/31/2012 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 8.44 | 8.44 |
| | | | Sub Total: | | 0.00 | 0.00 | 24.86 | 24.86 |
| FEB-2012 | 1273055 | 02/24/2012 | GDS & INTERNET BKGS | | 0.00 | 0.00 | 2.31 | 2.31 |
| | 26222681 | 02/22/2012 | WYNREWARDS 5% | | 0.00 | 0.00 | 9.13 | 9.13 |
| | 42071602 | 02/29/2012 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 6.66 | 6.66 |
| | 42072457 | 02/29/2012 | 5096A-SOFTHOTEL SW MAINT | | 0.00 | 0.00 | 12.94 | 12.94 |
| | 42085720 | 02/29/2012 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 64.53 | 64.53 |
| | 42087178 | 02/29/2012 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 107.54 | 107.54 |
| | | | Sub Total: | | 0.00 | 0.00 | 203.11 | 203.11 |
| MAR-2012 | 10599487 | 03/29/2012 | GUEST SRVCS TRANSACTION CHARGE | | 0.00 | 0.00 | 6.24 | 6.24 |
| | 10599489 | 03/29/2012 | GUEST SATISFACTION | | 0.00 | 0.00 | 3.43 | 3.43 |
| | 26226339 | 03/22/2012 | WYNREWARDS 5% | | 0.00 | 0.00 | 17.64 | 17.64 |
| | 42099420 | 03/22/2012 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 6.58 | 6.58 |
| | 42100954 | 03/31/2012 | 5096A-SOFTHOTEL SW MAINT | | 0.00 | 0.00 | 12.77 | 12.77 |
| | 42119108 | 03/31/2012 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 165.04 | 165.04 |
| | 42120127 | 03/31/2012 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 99.03 | 99.03 |
| | | | Sub Total: | | 0.00 | 0.00 | 310.73 | 310.73 |
| APR-2012 | 1279767 | 04/09/2012 | GDS & INTERNET BKGS | | 0.00 | 0.00 | 2.32 | 2.32 |
| | 26230248 | 04/22/2012 | WYNREWARDS 5% | | 0.00 | 0.00 | 7.02 | 7.02 |
| | 42128240 | 04/30/2012 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 3.98 | 3.98 |
| | 42128941 | 04/30/2012 | 5096A-SOFTHOTEL SW MAINT | | 0.00 | 0.00 | 7.73 | 7.73 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | 42143605 | 04/30/2012 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 65.87 | 65.87 |
| | 42145332 | 04/30/2012 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 39.52 | 39.52 |
| | | | Sub Total: | | 0.00 | 0.00 | 126.44 | 126.44 |
| MAY-2012 | 26232323 | 05/22/2012 | WYNREWARDS 5% | | 0.00 | 0.00 | 6.85 | 6.85 |
| | 42158536 | 05/31/2012 | 5096A-SOFTHOTEL SW MAINT | | 0.00 | 0.00 | 12.94 | 12.94 |
| | 42159709 | 05/31/2012 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 6.66 | 6.66 |
| | 42181540 | 05/31/2012 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 105.12 | 105.12 |
| | 42183295 | 05/31/2012 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 63.07 | 63.07 |
| | TM0292628 | 05/25/2012 | MEMBER BENEFIT COMM | | 0.00 | 0.00 | 3.56 | 3.56 |
| | | | Sub Total: | | 0.00 | 0.00 | 198.20 | 198.20 |
| JUN-2012 | 26235546 | 06/22/2012 | WYNREWARDS 5% | | 0.00 | 0.00 | 12.90 | 12.90 |
| | 42193289 | 06/30/2012 | 5096A-SOFTHOTEL SW MAINT | | 0.00 | 0.00 | 12.94 | 12.94 |
| | 42193341 | 06/30/2012 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 6.66 | 6.66 |
| | 42209025 | 06/30/2012 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 153.73 | 153.73 |
| | 42210221 | 06/30/2012 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 92.24 | 92.24 |
| | TM0298534 | 06/26/2012 | MEMBER BENEFIT COMM | | 0.00 | 0.00 | 3.97 | 3.97 |
| | | | Sub Total: | | 0.00 | 0.00 | 282.44 | 282.44 |
| JUL-2012 | 10617389 | 07/05/2012 | GUEST SATISFACTION | | 0.00 | 0.00 | 8.01 | 8.01 |
| | 10617455 | 07/05/2012 | GUEST SRVCS TRANSACTION CHARGE | | 0.00 | 0.00 | 10.68 | 10.68 |
| | 10618255 | 07/05/2012 | GUEST SRVCS TRANSACTION CHARGE | | 0.00 | 0.00 | 10.68 | 10.68 |
| | 10618335 | 07/05/2012 | GUEST SATISFACTION | | 0.00 | 0.00 | 4.35 | 4.35 |
| | 1305791 | 07/25/2012 | GDS & INTERNET BKGS | | 0.00 | 0.00 | 2.27 | 2.27 |
| | 26240909 | 07/22/2012 | WYNREWARDS 5% | | 0.00 | 0.00 | 15.94 | 15.94 |
| | 42225621 | 07/30/2012 | 5096A-SOFTHOTEL SW MAINT | | 0.00 | 0.00 | 14.76 | 14.76 |
| | 42227334 | 07/30/2012 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 9.39 | 9.39 |
| | 42242609 | 07/31/2012 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 181.22 | 181.22 |
| | 42244549 | 07/31/2012 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 150.85 | 150.85 |
| | TM0305791 | 07/25/2012 | MEMBER BENEFIT COMM | | 0.00 | 0.00 | 4.99 | 4.99 |
| | | | Sub Total: | | 0.00 | 0.00 | 413.14 | 413.14 |
| AUG-2012 | 1311309 | 08/24/2012 | GDS & INTERNET BKGS | | 0.00 | 0.00 | 7.95 | 7.95 |
| | 26243394 | 08/22/2012 | WYNREWARDS 5% | | 0.00 | 0.00 | 16.07 | 16.07 |
| | 30705998 | 08/06/2012 | Apr 2012 NT Audit | | 600.00 | 0.00 | 400.00 | 1,000.00 |
| | 30706069 | 08/06/2012 | Apr 2012 NT Audit | | 1,000.00 | 0.00 | 666.71 | 1,666.71 |
| | 42254097 | 08/31/2012 | 5096A-SOFTHOTEL SW MAINT | | 0.00 | 0.00 | 18.06 | 18.06 |
| | 42254939 | 08/31/2012 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 9.30 | 9.30 |
| | 42272314 | 08/31/2012 | Actual-1000A-ROYALTY FEE | | 2.00 | 0.00 | 155.85 | 157.85 |
| | 42273852 | 08/24/2012 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 93.17 | 93.17 |
| | TA0311309 | 08/24/2012 | T/A COMMISSIONS | | 0.00 | 0.00 | 6.27 | 6.27 |
| | TM0311309 | 08/24/2012 | MEMBER BENEFIT COMM | | 0.00 | 0.00 | 5.16 | 5.16 |
| | | | Sub Total: | | 1,602.00 | 0.00 | 1,378.54 | 2,980.54 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| SEP-2012 | 1317724 | 09/25/2012 | GDS & INTERNET BKGS | | 0.00 | 0.00 | 2.97 | 2.97 |
| | 26246432 | 09/22/2012 | WYNREWARDS 5% | | 0.00 | 0.00 | 7.28 | 7.28 |
| | 30002260 | 09/22/2012 | RES CENTRAL(CALL TRANSFER) | | 0.00 | 0.00 | 2.92 | 2.92 |
| | 30717428 | 09/12/2012 | MXY Photography | | 0.00 | 0.00 | 86.94 | 86.94 |
| | 42287681 | 09/30/2012 | 5096A-SOFTHOTEL SW MAINT | | 0.00 | 0.00 | 19.14 | 19.14 |
| | 42302076 | 09/30/2012 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 9.38 | 9.38 |
| | 42302505 | 09/30/2012 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 94.69 | 94.69 |
| | | | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 56.82 | 56.82 |
| | TA0317724 | 09/25/2012 | T/A COMMISSIONS | | 0.00 | 0.00 | 5.52 | 5.52 |
| | TM0317724 | 09/25/2012 | MEMBER BENEFIT COMM | | 0.00 | 0.00 | 6.01 | 6.01 |
| | | | **Sub Total:** | | **0.00** | **0.00** | **291.67** | **291.67** |
| OCT-2012 | 1323889 | 10/28/2012 | GDS & INTERNET BKGS | | 0.00 | 0.00 | 4.29 | 4.29 |
| | 26248958 | 10/22/2012 | WYNREWARDS 5% | | 0.00 | 0.00 | 10.26 | 10.26 |
| | 30002319 | 10/22/2012 | RES CENTRAL(CALL TRANSFER) | | 0.00 | 0.00 | 2.86 | 2.86 |
| | 30727018 | 10/02/2012 | SUPER8 TRAINING | | 0.00 | 0.00 | 10.90 | 10.90 |
| | 30733445 | 10/31/2012 | HughesNet VSAT | | 0.00 | 0.00 | 9.08 | 9.08 |
| | 42317429 | 10/31/2012 | 5096A-SOFTHOTEL SW MAINT | | 66.08 | 5.37 | 59.71 | 131.16 |
| | 42334929 | 10/31/2012 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 99.99 | 99.99 |
| | 42335207 | 10/31/2012 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 60.00 | 60.00 |
| | TA0323889 | 10/28/2012 | T/A COMMISSIONS | | 0.00 | 0.00 | 7.70 | 7.70 |
| | TM0323889 | 10/28/2012 | MEMBER BENEFIT COMM | | 0.00 | 0.00 | 4.87 | 4.87 |
| | | | **Sub Total:** | | **66.08** | **5.37** | **269.66** | **341.11** |
| NOV-2012 | 1330998 | 11/19/2012 | GDS & INTERNET BKGS | | 0.00 | 0.00 | 3.67 | 3.67 |
| | 26253414 | 11/22/2012 | WYNREWARDS 5% | | 0.00 | 0.00 | 9.86 | 9.86 |
| | 26254694 | 11/22/2012 | WYNREWARDS BONUS | | 0.00 | 0.00 | 2.57 | 2.57 |
| | 30002391 | 11/22/2012 | RES CENTRAL(CALL TRANSFER) | | 0.00 | 0.00 | 2.84 | 2.84 |
| | 42350176 | 11/30/2012 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 9.16 | 9.16 |
| | 42350815 | 11/30/2012 | 5096A-SOFTHOTEL SW MAINT | | 0.00 | 0.00 | 18.70 | 18.70 |
| | 42364076 | 11/30/2012 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 76.90 | 76.90 |
| | 42367378 | 11/30/2012 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 128.16 | 128.16 |
| | TA0330998 | 11/19/2012 | T/A COMMISSIONS | | 0.00 | 0.00 | 2.22 | 2.22 |
| | TA0336886 | 11/26/2012 | T/A COMMISSIONS | | 0.00 | 0.00 | 3.23 | 3.23 |
| | TM0336886 | 11/26/2012 | MEMBER BENEFIT COMM | | 0.00 | 0.00 | 2.85 | 2.85 |
| | | | **Sub Total:** | | **0.00** | **0.00** | **260.16** | **260.16** |
| DEC-2012 | 1343078 | 12/19/2012 | GDS & INTERNET BKGS | | 0.00 | 0.00 | 3.25 | 3.25 |
| | 26257269 | 12/22/2012 | WYNREWARDS 5% | | 0.00 | 0.00 | 9.74 | 9.74 |
| | 26257815 | 12/22/2012 | WYNREWARDS BONUS | | 0.00 | 0.00 | 5.85 | 5.85 |
| | 30002448 | 12/22/2012 | RES CENTRAL(CALL TRANSFER) | | 0.00 | 0.00 | 2.86 | 2.86 |
| | 42377171 | 12/31/2012 | 5096A-SOFTHOTEL SW MAINT | | 0.00 | 0.00 | 18.53 | 18.53 |
| | 42380391 | 12/31/2012 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 9.08 | 9.08 |
| | 42397478 | 12/31/2012 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 75.89 | 75.89 |
| | 42398765 | 12/31/2012 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 126.48 | 126.48 |
| | | | **Sub Total:** | | **0.00** | **0.00** | **251.68** | **251.68** |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| JAN-2013 | 1350083 | 01/25/2013 | GDS & INTERNET BKGS | | 0.00 | 0.00 | 2.68 | 2.68 |
| | 26259982 | 01/22/2013 | WYNREWARDS 5% | | 0.00 | 0.00 | 10.12 | 10.12 |
| | 26261550 | 01/22/2013 | WYNREWARDS BONUS | | 0.00 | 0.00 | 7.27 | 7.27 |
| | 30002501 | 01/22/2013 | RES CENTRAL(CALL TRANSFER) | | 0.00 | 0.00 | 2.86 | 2.86 |
| | 42411384 | 01/31/2013 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 9.08 | 9.08 |
| | 42413230 | 01/31/2013 | 5096A-SOFT HOTEL SW MAINT | | 0.00 | 0.00 | 18.53 | 18.53 |
| | 42428542 | 01/31/2013 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 51.90 | 51.90 |
| | 42429720 | 01/31/2013 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 86.50 | 86.50 |
| | TA0350083 | 01/25/2013 | T/A COMMISSIONS | | 0.00 | 0.00 | 2.91 | 2.91 |
| | | | Sub Total: | | 0.00 | 0.00 | 191.85 | 191.85 |
| FEB-2013 | 1357095 | 02/25/2013 | GDS & INTERNET BKGS | | 0.00 | 0.00 | 2.64 | 2.64 |
| | 26263168 | 02/22/2013 | WYNREWARDS 5% | | 0.00 | 0.00 | 8.95 | 8.95 |
| | 30002616 | 02/22/2013 | RES CENTRAL(CALL TRANSFER) | | 0.00 | 0.00 | 2.08 | 2.08 |
| | 42435671 | 02/28/2013 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 6.66 | 6.66 |
| | 42440171 | 02/28/2013 | 5096A-WYNGUEST SW MAINT | | 0.00 | 0.00 | 13.59 | 13.59 |
| | 42460053 | 02/28/2013 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 91.19 | 91.19 |
| | 42460159 | 02/28/2013 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 54.72 | 54.72 |
| | | | Sub Total: | | 0.00 | 0.00 | 179.83 | 179.83 |
| MAR-2013 | 26267151 | 03/22/2013 | WYNREWARDS 5% | | 0.00 | 0.00 | 11.41 | 11.41 |
| | 30002640 | 03/22/2013 | RES CENTRAL(CALL TRANSFER) | | 0.00 | 0.00 | 2.13 | 2.13 |
| | 42468669 | 03/31/2013 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 6.58 | 6.58 |
| | 42470071 | 03/31/2013 | 5096A-WYNGUEST SW MAINT | | 0.00 | 0.00 | 13.42 | 13.42 |
| | 42485725 | 03/31/2013 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 111.53 | 111.53 |
| | 42485774 | 03/31/2013 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 185.87 | 185.87 |
| | | | Sub Total: | | 0.00 | 0.00 | 330.94 | 330.94 |
| APR-2013 | 1369977 | 04/23/2013 | GDS & INTERNET BKGS | | 0.00 | 0.00 | 3.45 | 3.45 |
| | 26269601 | 04/22/2013 | WYNREWARDS BONUS | | 0.00 | 0.00 | 2.62 | 2.62 |
| | 26270153 | 04/22/2013 | WYNREWARDS 5% | | 0.00 | 0.00 | 20.39 | 20.39 |
| | 30002687 | 04/22/2013 | RES CENTRAL(CALL TRANSFER) | | 0.00 | 0.00 | 2.91 | 2.91 |
| | 42501460 | 04/30/2013 | 5096A-WYNGUEST SW MAINT | | 0.00 | 0.00 | 19.09 | 19.09 |
| | 42501574 | 04/30/2013 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 9.35 | 9.35 |
| | 42520270 | 04/30/2013 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 172.17 | 172.17 |
| | 42520271 | 04/30/2013 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 103.29 | 103.29 |
| | | | Sub Total: | | 0.00 | 0.00 | 333.27 | 333.27 |
| MAY-2013 | 26274811 | 05/22/2013 | WYNREWARDS 5% | | 0.00 | 0.00 | 10.56 | 10.56 |
| | 30002821 | 05/22/2013 | RES CENTRAL(CALL TRANSFER) | | 0.00 | 0.00 | 2.91 | 2.91 |
| | 30793845 | 05/10/2013 | AUDIT ROYALTY | | 0.00 | 0.00 | 173.17 | 173.17 |
| | 30793846 | 05/10/2013 | AUDIT ADVERTISING | | 0.00 | 0.00 | 103.91 | 103.91 |
| | 30793847 | 05/10/2013 | AUDIT INTEREST FEE | | 0.00 | 0.00 | 63.58 | 63.58 |
| | 30793848 | 05/10/2013 | AUDIT COST | | 0.00 | 0.00 | 49.00 | 49.00 |
| | 30796478 | 05/24/2013 | AUDIT ROYALTY | | 5,907.60 | 0.00 | 3,107.39 | 9,014.99 |
| | 30796479 | 05/24/2013 | AUDIT ADVERTISING | | 3,544.56 | 0.00 | 1,864.45 | 5,409.01 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | 42533613 | 05/31/2013 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 9.26 | 9.26 |
| | 42533668 | 05/31/2013 | 5096A-WYNGUEST SW MAINT | | 0.00 | 0.00 | 18.91 | 18.91 |
| | 42549375 | 05/31/2013 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 151.41 | 151.41 |
| | 42549397 | 05/31/2013 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 90.85 | 90.85 |
| | TM0375850 | 05/21/2013 | MEMBER BENEFIT COMM | | 0.00 | 0.00 | 2.30 | 2.30 |
| | | | **Sub Total:** | | 9,452.16 | 0.00 | 5,647.70 | 15,099.86 |
| JUN-2013 | 26278382 | 06/22/2013 | WYNREWARDS 5% | | 0.00 | 0.00 | | |
| | 30811640 | 06/30/2013 | unprocessed GDS fees | | 0.00 | 0.00 | 11.05 | 11.05 |
| | 42556737 | 06/30/2013 | 5096A-WYNGUEST SW MAINT | | 0.00 | 0.00 | 3.08 | 3.08 |
| | 42556968 | 06/30/2013 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 13.61 | 13.61 |
| | 42579916 | 06/30/2013 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 6.67 | 6.67 |
| | 42579952 | 06/30/2013 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 135.38 | 135.38 |
| | TA0383176 | 06/20/2013 | T/A COMMISSIONS | | 0.00 | 0.00 | 81.23 | 81.23 |
| | | | | | 0.00 | 0.00 | 2.41 | 2.41 |
| | | | **Sub Total:** | | 0.00 | 0.00 | 253.43 | 253.43 |
| JUL-2013 | 1389121 | 07/18/2013 | GDS & INTERNET BKGS | | 0.00 | 0.00 | 4.81 | 4.81 |
| | 26281259 | 07/22/2013 | WYNREWARDS BONUS | | 0.00 | 0.00 | 2.58 | 2.58 |
| | 26281737 | 07/22/2013 | WYNREWARDS 5% | | 0.00 | 0.00 | 14.28 | 14.28 |
| | 42593014 | 07/31/2013 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 6.67 | 6.67 |
| | 42593160 | 07/31/2013 | 5096A-WYNGUEST SW MAINT | | 0.00 | 0.00 | 13.61 | 13.61 |
| | 42606401 | 07/31/2013 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 157.60 | 157.60 |
| | 42606403 | 07/31/2013 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 94.56 | 94.56 |
| | TA0389121 | 07/18/2013 | T/A COMMISSIONS | | 0.00 | 0.00 | 3.30 | 3.30 |
| | TM0389121 | 07/18/2013 | MEMBER BENEFIT COMM | | 0.00 | 0.00 | 2.67 | 2.67 |
| | | | **Sub Total:** | | 0.00 | 0.00 | 300.08 | 300.08 |
| AUG-2013 | 1396688 | 08/23/2013 | GDS & INTERNET BKGS | | 0.00 | 0.00 | | |
| | 26286226 | 08/22/2013 | WYNREWARDS 5% | | 0.00 | 0.00 | 2.28 | 2.28 |
| | 30828912 | 08/22/2013 | On Site Fee | | 0.00 | 0.00 | 10.13 | 10.13 |
| | 42616885 | 08/31/2013 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 3.05 | 3.05 |
| | 42620018 | 08/31/2013 | 5096A-WYNGUEST SW MAINT | | 0.00 | 0.00 | 3.98 | 3.98 |
| | 42640891 | 08/31/2013 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 8.13 | 8.13 |
| | 42640936 | 08/31/2013 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 76.42 | 76.42 |
| | | | | | 0.00 | 0.00 | 45.85 | 45.85 |
| | | | **Sub Total:** | | 0.00 | 0.00 | 149.84 | 149.84 |
| SEP-2013 | 1410108 | 09/25/2013 | GDS & INTERNET BKGS | | 0.00 | 0.00 | 14.12 | 14.12 |
| | 26286615 | 09/22/2013 | WYNREWARDS 5% | | 0.00 | 0.00 | 49.87 | 49.87 |
| | 26290155 | 09/22/2013 | WYNREWARDS BONUS | | 0.00 | 0.00 | 6.26 | 6.26 |
| | 30838987 | 09/17/2013 | SUPER8 TRAINING | | 0.00 | 0.00 | 58.05 | 58.05 |
| | 42647359 | 09/30/2013 | 5715A-HughesNet VSAT | | 144.11 | 11.89 | 77.29 | 233.29 |
| | 42650076 | 09/30/2013 | 5096A-WYNGUEST SW MAINT | | 0.00 | 0.00 | 112.47 | 112.47 |
| | 42665572 | 09/30/2013 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 630.86 | 630.86 |
| | 42665574 | 09/30/2013 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 378.47 | 378.47 |
| | TA0410108 | 09/25/2013 | T/A COMMISSIONS | | 0.00 | 0.00 | 4.59 | 4.59 |
| | TM0410108 | 09/25/2013 | MEMBER BENEFIT COMM | | 0.00 | 0.00 | 15.52 | 15.52 |
| | | | **Sub Total:** | | 144.11 | 11.89 | 1,347.50 | 1,503.50 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| OCT-2013 | 1416706 | 10/25/2013 | GDS & INTERNET BKGS | | 0.00 | 0.00 | 12.44 | 12.44 |
| | 26292558 | 10/22/2013 | WYNREWARDS BONUS | | 0.00 | 0.00 | 3.03 | 3.03 |
| | 26292701 | 10/22/2013 | WYNREWARDS 5% | | 0.00 | 0.00 | 52.37 | 52.37 |
| | 30848554 | 10/16/2013 | HUGHESNET DECOMMISSION FEES | | 0.00 | 0.00 | 98.10 | 98.10 |
| | 42680286 | 10/31/2013 | 5715A-HughesNet VSAT | | 0.00 | 0.00 | 50.80 | 50.80 |
| | 42681142 | 10/31/2013 | 5096A-WYNGUEST SW MAINT | | 0.00 | 0.00 | 106.83 | 106.83 |
| | 42699661 | 10/31/2013 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 690.53 | 690.53 |
| | 42699662 | 10/31/2013 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 414.28 | 414.28 |
| | TA0416706 | 10/25/2013 | T/A COMMISSIONS | | 0.00 | 0.00 | 9.54 | 9.54 |
| | TC0416706 | 10/25/2013 | T/A COMM SERVICE CHG | | 0.00 | 0.00 | 2.13 | 2.13 |
| | TM0416706 | 10/25/2013 | MEMBER BENEFIT COMM | | 0.00 | 0.00 | 17.59 | 17.59 |
| | | | **Sub Total:** | | 0.00 | 0.00 | 1,457.64 | 1,457.64 |
| NOV-2013 | 1423096 | 11/21/2013 | GDS & INTERNET BKGS | | 0.00 | 0.00 | 11.51 | 11.51 |
| | 26296637 | 11/22/2013 | WYNREWARDS BONUS | | 0.00 | 0.00 | 4.26 | 4.26 |
| | 26297229 | 11/22/2013 | WYNREWARDS 5% | | 0.00 | 0.00 | 50.28 | 50.28 |
| | 30857061 | 11/20/2013 | HughesNet VSAT | | 0.00 | 0.00 | 49.07 | 49.07 |
| | 42710587 | 11/30/2013 | 5096A-WYNGUEST SW MAINT | | 0.00 | 0.00 | 101.37 | 101.37 |
| | 42725372 | 11/30/2013 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 664.37 | 664.37 |
| | 42726386 | 11/30/2013 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 398.69 | 398.69 |
| | TA0423096 | 11/21/2013 | T/A COMMISSIONS | | 0.00 | 0.00 | 3.43 | 3.43 |
| | TM0423096b | 11/21/2013 | MEMBER BENEFIT COMM | | 0.00 | 0.00 | 8.54 | 8.54 |
| | | | **Sub Total:** | | 0.00 | 0.00 | 1,291.52 | 1,291.52 |
| DEC-2013 | 1430006 | 12/27/2013 | GDS & INTERNET BKGS | | 0.00 | 0.00 | 9.58 | 9.58 |
| | 26298997 | 12/22/2013 | WYNREWARDS BONUS | | 0.00 | 0.00 | 4.04 | 4.04 |
| | 26300298 | 12/22/2013 | WYNREWARDS 5% | | 0.00 | 0.00 | 48.58 | 48.58 |
| | 42733087 | 12/31/2013 | 5096A-WYNGUEST SW MAINT | | 0.00 | 0.00 | 95.73 | 95.73 |
| | 42752684 | 12/31/2013 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 665.43 | 665.43 |
| | 42752686 | 12/31/2013 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 399.23 | 399.23 |
| | TA0430006 | 12/27/2013 | T/A COMMISSIONS | | 0.00 | 0.00 | 21.20 | 21.20 |
| | TC0430006 | 12/27/2013 | T/A COMM SERVICE CHG | | 0.00 | 0.00 | 8.59 | 8.59 |
| | TM0430006 | 12/27/2013 | MEMBER BENEFIT COMM | | 0.00 | 0.00 | 69.07 | 69.07 |
| | | | **Sub Total:** | | 0.00 | 0.00 | 1,321.45 | 1,321.45 |
| JAN-2014 | 10717831 | 01/15/2014 | GUEST SRVCS TRANSACTION CHARGE | | 0.00 | 0.00 | 40.88 | 40.88 |
| | 10718500 | 01/15/2014 | GUEST SATISFACTION | | 0.00 | 0.00 | 10.22 | 10.22 |
| | 1443185 | 01/24/2014 | GDS & INTERNET BKGS | | 0.00 | 0.00 | 2.79 | 2.79 |
| | 26304215 | 01/22/2014 | WYNREWARDS 5% | | 0.00 | 0.00 | 26.05 | 26.05 |
| | 30874061 | 01/10/2014 | CK#652565 | | 0.00 | 0.00 | 25.80 | 25.80 |
| | 42762898 | 01/31/2014 | 5096A-WYNGUEST SW MAINT | | 0.00 | 0.00 | 90.09 | 90.09 |
| | 42780660 | 01/31/2014 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 447.30 | 447.30 |
| | 42780661 | 01/31/2014 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 268.42 | 268.42 |
| | TA0443185 | 01/24/2014 | T/A COMMISSIONS | | 0.00 | 0.00 | 3.70 | 3.70 |
| | TM0443185 | 01/24/2014 | MEMBER BENEFIT COMM | | 0.00 | 0.00 | 5.02 | 5.02 |
| | | | **Sub Total:** | | 0.00 | 0.00 | 920.27 | 920.27 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| FEB-2014 | 26307609 | 02/22/2014 | WYNREWARDS 5% | | 0.00 | 0.00 | 15.45 | 15.45 |
| | 42795268 | 02/28/2014 | 5096A-WYNGUEST SW MAINT | | 0.00 | 0.00 | 84.99 | 84.99 |
| | 42811602 | 02/28/2014 | Actual-1000A-ROYALTY FEE | | 0.00 | 0.00 | 519.28 | 519.28 |
| | 42811603 | 02/28/2014 | Actual-1215A-ADVERTISING | | 0.00 | 0.00 | 311.59 | 311.59 |
| | TA0450292 | 02/25/2014 | T/A COMMISSIONS | | 0.00 | 0.00 | 3.00 | 3.00 |
| | | | Sub Total: | | 0.00 | 0.00 | 934.31 | 934.31 |
| MAR-2014 | 26311386 | 03/22/2014 | WYNREWARDS 5% | | 0.00 | 0.00 | 8.74 | 8.74 |
| | 42822254 | 03/31/2014 | 5096A-WYNGUEST SW MAINT | | 0.00 | 0.00 | 79.35 | 79.35 |
| | 42838302 | 03/31/2014 | Actual-1000A-ROYALTY FEE | | 2,870.06 | 0.00 | 1,284.11 | 4,154.17 |
| | 42838303 | 03/31/2014 | Actual-1215A-ADVERTISING | | 2,329.61 | 0.00 | 863.08 | 3,192.69 |
| | | | Sub Total: | | 5,199.67 | 0.00 | 2,235.28 | 7,434.95 |
| APR-2014 | 10730132 | 04/10/2014 | GUEST SATISFACTION | | 78.00 | 0.00 | 28.52 | 106.52 |
| | 10730537 | 04/10/2014 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 58.48 | 218.48 |
| | 26315072 | 04/22/2014 | WYNREWARDS 5% | | 19.37 | 0.00 | 6.95 | 26.32 |
| | 42850739 | 04/30/2014 | 5096A-WYNGUEST SW MAINT | | 336.34 | 27.75 | 129.41 | 493.50 |
| | 42866537 | 04/30/2014 | Actual-1000A-ROYALTY FEE | | 3,128.10 | 0.00 | 1,117.16 | 4,245.26 |
| | 42866538 | 04/30/2014 | Actual-1215A-ADVERTISING | | 1,876.86 | 0.00 | 670.25 | 2,547.11 |
| | | | Sub Total: | | 5,598.67 | 27.75 | 2,010.77 | 7,637.19 |
| MAY-2014 | 26322284 | 05/22/2014 | WYNREWARDS 5% | | 243.40 | 0.00 | 83.82 | 327.22 |
| | 42880482 | 05/31/2014 | 5096A-WYNGUEST SW MAINT | | 336.34 | 27.75 | 123.77 | 487.86 |
| | 42897004 | 05/31/2014 | Actual-1000A-ROYALTY FEE | | 2,574.74 | 0.00 | 875.41 | 3,450.15 |
| | 42897117 | 05/31/2014 | Actual-1215A-ADVERTISING | | 1,544.84 | 0.00 | 525.27 | 2,070.11 |
| | | | Sub Total: | | 4,699.32 | 27.75 | 1,608.27 | 6,335.34 |
| JUN-2014 | 26327224 | 06/22/2014 | WYNREWARDS 5% | | 131.90 | 0.00 | 43.37 | 175.27 |
| | 42907406 | 06/30/2014 | 5096A-WYNGUEST SW MAINT | | 336.34 | 27.75 | 118.31 | 482.40 |
| | 42923481 | 06/30/2014 | Actual-1000A-ROYALTY FEE | | 2,910.16 | 0.00 | 948.19 | 3,858.35 |
| | 42923482 | 06/30/2014 | Actual-1215A-ADVERTISING | | 1,746.09 | 0.00 | 568.89 | 2,314.98 |
| | | | Sub Total: | | 5,124.49 | 27.75 | 1,678.76 | 6,831.00 |
| JUL-2014 | 26332698 | 07/22/2014 | WYNREWARDS 5% | | 105.20 | 0.00 | 33.05 | 138.25 |
| | 42936821 | 07/31/2014 | 5096A-WYNGUEST SW MAINT | | 336.34 | 27.75 | 112.67 | 476.76 |
| | 42952664 | 07/31/2014 | Actual-1000A-ROYALTY FEE | | 4,320.27 | 0.00 | 1,338.71 | 5,658.98 |
| | 42952665 | 07/31/2014 | Actual-1215A-ADVERTISING | | 2,592.16 | 0.00 | 803.27 | 3,395.43 |
| | | | Sub Total: | | 7,353.97 | 27.75 | 2,287.70 | 9,669.42 |
| AUG-2014 | 26337212 | 08/22/2014 | WYNREWARDS 5% | | 134.93 | 0.00 | 40.26 | 175.19 |
| | 42961117 | 08/31/2014 | 5096A-WYNGUEST SW MAINT | | 336.29 | 27.73 | 107.01 | 471.03 |

Page 9 of 14

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | 42983662 | 08/31/2014 | Actual-1000A-ROYALTY FEE | | 2,364.66 | 0.00 | 698.95 | 3,063.61 |
| | 42983672 | 08/31/2014 | Actual-1215A-ADVERTISING | | 1,418.80 | 0.00 | 419.34 | 1,838.14 |
| | | | Sub Total: | | 4,254.68 | 27.73 | 1,265.56 | 5,547.97 |
| SEP-2014 | 26344818 | 09/22/2014 | WYNREWARDS 5% | | 55.75 | 0.00 | 15.78 | 71.53 |
| | 42995438 | 09/30/2014 | WYNGUEST SW MAINT:Franchisee::15335 01-SEP-14:3 1-AUG-15. | | 346.43 | 28.57 | 104.65 | 479.65 |
| | 43014359 | 09/30/2014 | Actual-1000A-ROYALTY FEE | | 1,856.41 | 0.00 | 505.07 | 2,361.48 |
| | 43014361 | 09/30/2014 | Actual-1215A-ADVERTISING | | 1,113.85 | 0.00 | 303.03 | 1,416.88 |
| | | | Sub Total: | | 3,372.44 | 28.57 | 928.53 | 4,329.54 |
| OCT-2014 | 26349718 | 10/22/2014 | WYNREWARDS 5% | | 86.71 | 0.00 | 23.22 | 109.93 |
| | 30956686 | 10/10/2014 | SUPER8 TRAINING | | 170.00 | 14.02 | 50.41 | 234.43 |
| | 30960473 | 10/17/2014 | GLOBAL CONFERENCE | | 1,049.00 | 0.00 | 212.44 | 1,261.44 |
| | 43018741 | 10/31/2014 | 5096A-WYNGUEST SW MAINT | | 346.43 | 28.57 | 98.84 | 473.84 |
| | 43037921 | 10/31/2014 | Actual-1000A-ROYALTY FEE | | 2,044.34 | 0.00 | 539.07 | 2,583.41 |
| | 43030082 | 10/31/2014 | Actual-1215A-ADVERTISING | | 1,226.61 | 0.00 | 323.43 | 1,550.04 |
| | | | Sub Total: | | 4,923.09 | 42.59 | 1,247.41 | 6,213.09 |
| NOV-2014 | 26355087 | 11/22/2014 | WYNREWARDS 5% | | 116.20 | 0.00 | 29.30 | 145.50 |
| | 43044997 | 11/30/2014 | 5096A-WYNGUEST SW MAINT | | 346.43 | 28.57 | 93.21 | 468.21 |
| | 43069644 | 11/30/2014 | Actual 1000A-ROYALTY FEE | | 2,113.23 | 0.00 | 525.16 | 2,638.39 |
| | 43069646 | 11/30/2014 | Actual 1215A-ADVERTISING | | 1,267.94 | 0.00 | 315.09 | 1,583.03 |
| | | | Sub Total: | | 3,843.80 | 28.57 | 962.76 | 4,835.13 |
| DEC-2014 | 26362162 | 12/22/2014 | WYNREWARDS 5% | | 205.36 | 0.00 | 48.77 | 254.13 |
| | 43073742 | 12/31/2014 | 5096A-WYNGUEST SW MAINT | | 346.43 | 28.57 | 87.40 | 462.40 |
| | 43099560 | 12/31/2014 | Actual-1000A-ROYALTY FEE | | 2,505.81 | 0.00 | 583.85 | 3,089.66 |
| | 43099561 | 12/31/2014 | Actual-1215A-ADVERTISING | | 1,503.49 | 0.00 | 350.29 | 1,853.78 |
| | | | Sub Total: | | 4,561.09 | 28.57 | 1,070.31 | 5,659.97 |
| JAN-2015 | 26367900 | 01/22/2015 | WYNREWARDS 5% | | 151.12 | 0.00 | 33.56 | 184.68 |
| | 43102670 | 01/31/2015 | 5096A-WYNGUEST SW MAINT | | 346.43 | 28.57 | 81.59 | 456.59 |
| | 43127745 | 01/31/2015 | Actual-1000A-ROYALTY FEE | | 2,148.95 | 0.00 | 467.37 | 2,616.32 |
| | 43127746 | 01/31/2015 | Actual-1215A-ADVERTISING | | 1,289.37 | 0.00 | 280.46 | 1,569.83 |
| | | | Sub Total: | | 3,935.87 | 28.57 | 862.98 | 4,827.42 |
| FEB-2015 | 26374043 | 02/22/2015 | WYNREWARDS 5% | | 186.03 | 0.00 | 38.41 | 224.44 |
| | 43128370 | 02/28/2015 | 5096A-WYNGUEST SW MAINT | | 346.43 | 28.57 | 76.33 | 451.33 |
| | 43153207 | 02/28/2015 | Actual-1215A-ADVERTISING | | 1,767.91 | 0.00 | 359.76 | 2,127.67 |
| | 43155497 | 02/28/2015 | Actual-1000A-ROYALTY FEE | | 2,946.52 | 0.00 | 599.61 | 3,546.13 |
| | | | Sub Total: | | 5,246.89 | 28.57 | 1,074.11 | 6,349.57 |

Page 10 of 14

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| MAR-2015 | 10792715 | 03/05/2015 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 32.16 | 192.16 |
| | 10793033 | 03/05/2015 | GUEST SATISFACTION | | | | | |
| | 26379556 | 03/22/2015 | WYNREWARDS 5% | | 67.30 | 0.00 | 13.53 | 80.83 |
| | 43157720 | 03/31/2015 | 5096A-WYNGUEST SW MAINT | | 294.32 | 0.00 | 56.64 | 350.96 |
| | 43183189 | 03/31/2015 | Actual-1215A-ADVERTISING | | 346.43 | 28.57 | 70.52 | 445.52 |
| | 43183364 | 03/31/2015 | Actual-1000A-ROYALTY FEE | | 2,761.13 | 0.00 | 519.13 | 3,280.26 |
| | | | | | 4,601.89 | 0.00 | 865.17 | 5,467.06 |
| | | | | Sub Total: | 8,231.07 | 28.57 | 1,557.15 | 9,816.79 |
| APR-2015 | 26383823 | 04/22/2015 | WYNREWARDS 5% | | 159.94 | 0.00 | 28.32 | 188.26 |
| | 43185847 | 04/30/2015 | 5096A-WYNGUEST SW MAINT | | 346.43 | 28.57 | 64.89 | 439.89 |
| | 43211160 | 04/30/2015 | Actual-1000A-ROYALTY FEE | | 3,455.12 | 0.00 | 597.73 | 4,052.85 |
| | 43211163 | 04/30/2015 | Actual-1215A-ADVERTISING | | 2,073.07 | 0.00 | 358.65 | 2,431.72 |
| | | | | Sub Total: | 6,034.56 | 28.57 | 1,049.59 | 7,112.72 |
| MAY-2015 | 26392151 | 05/22/2015 | WYNREWARDS 5% | | 120.46 | 0.00 | 19.54 | 140.00 |
| | 43213621 | 05/31/2015 | 5096A-WYNGUEST SW MAINT | | 346.43 | 28.57 | 59.08 | 434.08 |
| | 43237041 | 05/31/2015 | Actual-1000A ROYALTY FEE | | 3,081.33 | 0.00 | 485.31 | 3,566.64 |
| | 43237042 | 05/31/2015 | Actual-1215A ADVERTISING | | 1,848.80 | 0.00 | 291.19 | 2,139.99 |
| | | | | Sub Total: | 5,397.02 | 28.57 | 855.12 | 6,280.71 |
| JUN-2015 | 10814311 | 06/18/2015 | GUEST SATISFACTION | | 290.00 | 0.00 | 43.09 | 333.09 |
| | 10814454 | 06/18/2015 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 23.76 | 183.76 |
| | 26399486 | 06/22/2015 | WYNREWARDS 5% | | 196.91 | 0.00 | 28.84 | 225.75 |
| | 31035639 | 06/30/2015 | TMC RADIUS CREDIT | | -29.15 | 0.00 | 0.00 | -29.15 |
| | 43243039 | 06/30/2015 | 5096A-WYNGUEST SW MAINT | | 346.43 | 28.57 | 53.45 | 428.45 |
| | 43266472 | 06/30/2015 | Actual-1000A-ROYALTY FEE | | 2,683.84 | 0.00 | 382.46 | 3,066.30 |
| | 43266480 | 06/30/2015 | Actual-1215A-ADVERTISING | | 1,610.30 | 0.00 | 229.45 | 1,839.75 |
| | | | | Sub Total: | 5,258.33 | 28.57 | 761.05 | 6,047.95 |
| JUL-2015 | 26406640 | 07/22/2015 | WYNREWARDS 5% | | 183.46 | 0.00 | 24.11 | 207.57 |
| | 43270579 | 07/31/2015 | 5096A-WYNGUEST SW MAINT | | 346.43 | 28.57 | 47.63 | 422.63 |
| | 43294577 | 07/31/2015 | Accrual-1000A-ROYALTY FEE | | 5,090.85 | 0.00 | 646.54 | 5,737.39 |
| | 43294581 | 07/31/2015 | Accrual-1215A-ADVERTISING | | 3,054.51 | 0.00 | 387.91 | 3,442.42 |
| | | | | Sub Total: | 8,675.25 | 28.57 | 1,106.19 | 9,810.01 |
| AUG-2015 | 26414957 | 08/22/2015 | WYNREWARDS 5% | | 356.51 | 0.00 | 41.37 | 397.88 |
| | 26415618 | 08/22/2015 | WYNREWARDS BONUS | | 32.50 | 0.00 | 3.76 | 36.26 |
| | 26415664 | 08/22/2015 | WYNREWARDS GOFASTCR | | -180.75 | 0.00 | 0.00 | -180.75 |
| | 26415665 | 08/22/2015 | WYNREWARDS GOFREECR | | -262.28 | 0.00 | 0.00 | -262.28 |
| | 31047237 | 08/10/2015 | CRS Restrict Fee | | 4,000.00 | 0.00 | 488.00 | 4,488.00 |
| | 31047866 | 08/17/2015 | Aug 2014 NT Audit | | 750.00 | 0.00 | 88.90 | 838.90 |
| | 31047867 | 08/17/2015 | Aug 2014 NT Audit | | 450.00 | 0.00 | 53.35 | 503.35 |

Page 11 of 14

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | 31048084 | 08/17/2015 | Sep 2014 NT Audit | | 250.00 | 0.00 | 29.65 | 279.65 |
| | 31048085 | 08/17/2015 | Sep 2014 NT Audit | | 150.00 | 0.00 | 17.80 | 167.80 |
| | 43296836 | 08/31/2015 | 5096A-WYNGUEST SW MAINT | | 346.39 | 28.56 | 41.80 | 416.75 |
| | 43321442 | 08/31/2015 | Accrual-1000A-ROYALTY FEE | | 2,716.80 | 0.00 | 302.91 | 3,019.71 |
| | 43321443 | 08/31/2015 | Accrual-1215A-ADVERTISING | | 1,630.08 | 0.00 | 181.77 | 1,811.85 |
| | | | | Sub Total: | 10,239.25 | 28.56 | 1,249.31 | 11,517.12 |
| SEP 2015 | 100428 | 09/30/2015 | RETRAINFEE-SEP2015-1 | | 250.00 | 0.00 | 24.15 | 274.15 |
| | 10837066 | 09/30/2015 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 17.60 | 177.60 |
| | 10839664 | 09/03/2015 | GUEST SATISFACTION | | 120.00 | 0.00 | 13.20 | 133.20 |
| | 1582236 | 09/22/2015 | GDS & INTERNET BKGS | | 98.35 | 0.00 | 9.88 | 108.23 |
| | 26419785 | 09/22/2015 | WYNREWARDS BONUS | | 15.00 | 0.00 | 1.51 | 16.51 |
| | 26421274 | 09/22/2015 | WYNREWARDS GOFASTCR | | -99.06 | 0.00 | 0.00 | -99.06 |
| | 26421275 | 09/22/2015 | WYNREWARDS GOFREECR | | -31.50 | 0.00 | 0.00 | -31.50 |
| | 26424854 | 09/22/2015 | WR FREE ENROLLMENTS | | -72.24 | 0.00 | 0.00 | -72.24 |
| | 26424855 | 09/22/2015 | WYNREWARDS 5% | | 338.75 | 0.00 | 34.04 | 372.79 |
| | 31063801 | 09/29/2015 | SUPER8 TRAINING | | 170.00 | 14.02 | 17.85 | 201.87 |
| | 43323603 | 09/30/2015 | 5096A-WYNGUEST SW MAINT | | 356.82 | 29.43 | 37.28 | 423.53 |
| | 43350363 | 09/30/2015 | Accrual-1000A-ROYALTY FEE | | 2,033.65 | 0.00 | 196.24 | 2,229.89 |
| | 43350364 | 09/30/2015 | Accrual-1215A-ADVERTISING | | 1,220.19 | 0.00 | 117.73 | 1,337.92 |
| | TA0582236 | 09/22/2015 | T/A COMMISSIONS | | 60.71 | 0.00 | 6.10 | 66.81 |
| | TC0582236 | 09/22/2015 | T/A COMM SFRVt/CF CHG | | 10.60 | 0.00 | 1.05 | 11.65 |
| | TM0582236 | 09/22/2015 | MEMBER BENEFIT COMM | | 77.12 | 0.00 | 7.77 | 84.89 |
| | | | | Sub Total: | 4,708.39 | 43.45 | 484.40 | 5,236.24 |
| OCT-2015 | 101513 | 10/31/2015 | RETRAINFEE-OCT2015-0 | | 250.00 | 0.00 | 20.27 | 270.27 |
| | 1587750 | 10/19/2015 | GDS & INTERNET BKGS | | 12.10 | 0.00 | 1.06 | 13.16 |
| | 26428539 | 10/22/2015 | WR FREE ENROLLMENTS | | -77.66 | 0.00 | 0.00 | -77.66 |
| | 26428540 | 10/22/2015 | WYNREWARDS BONUS | | 306.26 | 0.00 | 26.19 | 332.45 |
| | 31078218 | 10/27/2015 | May 2015 NT Audit | | 359.02 | 0.00 | 29.79 | 388.81 |
| | 31078219 | 10/27/2015 | May 2015 NT Audit | | 215.41 | 0.00 | 17.88 | 233.29 |
| | 43352897 | 10/31/2015 | 5096A-WYNGUEST SW MAINT | | 356.82 | 29.43 | 31.29 | 417.54 |
| | 43376920 | 10/31/2015 | Accrual-1000A-ROYALTY FEE | | 2,098.80 | 0.00 | 169.99 | 2,268.79 |
| | 43376921 | 10/31/2015 | Accrual-1215A-ADVERTISING | | 1,259.28 | 0.00 | 102.01 | 1,361.29 |
| | TA0587750 | 10/19/2015 | T/A COMMISSIONS | | 37.41 | 0.00 | 3.25 | 40.66 |
| | TC0587750 | 10/19/2015 | T/A COMM SERVICE CHG | | 4.02 | 0.00 | 0.34 | 4.36 |
| | | | | Sub Total: | 4,821.46 | 29.43 | 402.07 | 5,252.96 |
| NOV-2015 | 102639 | 11/30/2015 | RETRAINFEE-NOV2015-0 | | 250.00 | 0.00 | 16.52 | 266.52 |
| | 26441123 | 11/22/2015 | WYNREWARDS 5% | | 223.86 | 0.00 | 15.68 | 239.54 |
| | 26443444 | 11/22/2015 | WR FREE ENROLLMENTS | | -38.96 | 0.00 | 0.00 | -38.96 |
| | 43379026 | 11/30/2015 | 5096A-WYNGUEST SW MAINT | | 356.82 | 29.43 | 25.49 | 411.74 |
| | 43403707 | 11/30/2015 | Accrual-1215A-ADVERTISING | | 1,276.29 | 0.00 | 84.23 | 1,360.52 |
| | 43403866 | 11/30/2015 | Accrual-1000A-ROYALTY FEE | | 2,127.15 | 0.00 | 140.39 | 2,267.54 |
| | TM0595844 | 11/20/2015 | MEMBER BENEFIT COMM | | 14.96 | 0.00 | 1.06 | 16.02 |
| | | | | Sub Total: | 4,210.12 | 29.43 | 283.37 | 4,522.92 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| DEC-2015 | 103209 | 12/31/2015 | RETRAINFEE-DEC2015-0 | | 250.00 | 0.00 | 12.64 | 262.64 |
| | 10860011 | 12/09/2015 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 9.84 | 169.84 |
| | 10861018 | 12/09/2015 | GUEST SATISFACTION | | 81.00 | | 4.99 | 85.99 |
| | 26453367 | 12/22/2015 | WR FREE ENROLLMENTS | | -129.39 | | 0.00 | -129.39 |
| | 26453068 | 12/22/2015 | WYNRREWARDS 5% | | 323.56 | | 17.80 | 341.36 |
| | 43406320 | 12/31/2015 | 5096A-WYNGUEST SW MAINT | | 356.82 | | 19.50 | 405.75 |
| | 43430516 | 12/31/2015 | Accrual-1000A-ROYALTY FEE | * | 1,935.05 | 29.43 | 97.72 | 2,032.77 |
| | 43430518 | 12/31/2015 | Accrual-1215A-ADVERTISING | * | 1,161.03 | | 58.64 | 1,219.67 |
| | | | | Sub Total: | 4,138.07 | 29.43 | 221.13 | 4,388.63 |
| JAN-2016 | 104479 | 01/31/2016 | RETRAINFEE-JAN2016-0 | | 250.00 | 0.00 | 8.76 | 258.76 |
| | 26457923 | 01/22/2016 | WYNRREWARDS 5% | | 513.04 | 0.00 | 20.27 | 533.31 |
| | 43435242 | 01/31/2016 | 5096A-WYNGUEST SW MAINT | | 356.82 | 29.43 | 13.52 | 399.77 |
| | 43457968 | 01/31/2016 | Accrual-1000A-ROYALTY FEE | * | 2,025.60 | 0.00 | 70.90 | 2,096.50 |
| | 43457969 | 01/31/2016 | Accrual-1215A-ADVERTISING | * | 1,215.36 | 0.00 | 42.54 | 1,257.90 |
| | | | | Sub Total: | 4,360.82 | 29.43 | 155.99 | 4,546.24 |
| FEB-2016 | 104744 | 02/29/2016 | RETRAINFEE-FEB2016-0 | | 250.00 | 0.00 | 5.13 | 255.13 |
| | 26471335 | 02/22/2016 | WR FREE ENROLLMENTS | | -6.12 | 0.00 | 0.00 | -6.12 |
| | 26471336 | 02/22/2016 | WYNRFEWARDS 5% | | 106.48 | 0.00 | 2.56 | 109.04 |
| | 31110729 | 02/05/2016 | AHLA FEE | | 124.00 | 0.00 | 0.00 | 124.00 |
| | 43467022 | 02/29/2016 | 5096A-WYNGUEST SW MAINT | | 356.82 | 29.43 | 7.91 | 394.16 |
| | 43483937 | 02/29/2016 | Accrual-1000A-ROYALTY FEE | * | 448.85 | 0.00 | 9.20 | 458.05 |
| | 43483938 | 02/29/2016 | Accrual-1215A-ADVERTISING | * | 269.31 | 0.00 | 5.52 | 274.83 |
| | | | | Sub Total: | 1,549.34 | 29.43 | 30.32 | 1,609.09 |
| MAR-2016 | 105623 | 03/31/2016 | RETRAINFEE-MAR2016-0 | | 250.00 | 0.00 | 1.25 | 251.25 |
| | 26477679 | 03/22/2016 | WYNREWARDS 5% | | 7.32 | 0.00 | 0.07 | 7.39 |
| | 31127491 | 03/10/2016 | OMEGA PROGRAM | | 5.00 | 0.31 | 0.08 | 5.39 |
| | 43493661 | 03/31/2016 | 5096A-WYNGUEST SW MAINT | | 356.82 | 29.43 | 1.93 | 388.18 |
| | 43511886 | 03/31/2016 | Accrual-1000A-ROYALTY FEE | * | 291.20 | 0.00 | 1.46 | 292.66 |
| | 43511887 | 03/31/2016 | Accrual-1215A-ADVERTISING | * | 174.72 | 0.00 | 0.87 | 175.59 |
| | | | | Sub Total: | 1,085.06 | 29.74 | 5.66 | 1,120.46 |
| APR-2016 | 106398 | 04/30/2016 | RETRAINFEE-APR2016-0 | | 250.00 | 0.00 | 0.00 | 250.00 |
| | 31138579 | 04/06/2016 | GLOBAL CONFERENCE | | 1,149.00 | 0.00 | 0.00 | 1,149.00 |
| | 43518258 | 04/30/2016 | 5096A-WYNGUEST SW MAINT | | 356.82 | 29.43 | 0.00 | 386.25 |
| | 43535168 | 04/30/2016 | Accrual-1215A-ADVERTISING | * | 205.74 | 0.00 | 0.00 | 205.74 |
| | 43537501 | 04/30/2016 | Accrual-1000A-ROYALTY FEE | * | 342.90 | 0.00 | 0.00 | 342.90 |
| | | | | Sub Total: | 2,304.46 | 29.43 | 0.00 | 2,333.89 |
| | | | | Grand Total: | 154,933.55 | 762.61 | 62,095.31 | 217,791.47 |

Requested By:  Kanyelle Barrino

* Please note the accruals on your account are estimates.
Make sure to promptly submit your actual gross room revenue and rooms sold.